**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **BRIDGET Y. TAYLOR,**       ) | |
|       ) | |
| **Defendant/Movant,**   ) | |
|       ) | |
| **vs.**       ) | **CASE NO. 2:07cv404-MHT** |
|       ) | **(CR NO. 2:06cr209-WKW)** |
| **UNITED STATES OF AMERICA,**       ) | |
|       ) | |
| **Respondent.**       ) | |

**UNITED STATES' RESPONSE TO § 2255 MOTION**

COMES NOW the United States of America, by and through its attorney, Leura G.
Canary, United States Attorney, and, in compliance with this Court's order, responds to
Defendant/Movant Bridget Y. Taylor Motion Under § 2255 to Vacate, Set Aside, Or Correct
Sentence By a Person In Federal Custody, as follows:

**I. PROCEDURAL HISTORY AND RELEVANT FACTS**

On August 16, 2006, a grand jury for the Middle District of Alabama returned a two-
count indictment against Defendant/Appellant Bridget Y. Taylor. See Exhibit A. Specifically,
the indictment charged that, in or about October 2000, in Montgomery, Alabama, within the
Middle District of Alabama, and elsewhere, Taylor did knowingly execute and attempt to execute
a scheme and artifice to defraud a financial institution and to obtain any of the moneys, funds,
credits, assets, securities and other property owned by and under the control of a financial
institution by means of false and fraudulent pretenses, representations, and promises, which
scheme and artifice consisted of obtaining a student loan from Regions Bank, the deposits of
which were insured by the Federal Deposit Insurance Corporation, through the use of a false
name and social security number:

On or about October 11, 2000, in Montgomery, Alabama, the defendant executed and attempted to execute the above described scheme to and artifice by using and certifying a fictitious name "Bridget Madison" and a false and fictitious social security number, to-wit: ███████, on Federal Family Education Loan Program - Federal Stafford Loan Promissory Note identifying Regions Bank, Mobile, Alabama, as Lender.

Resulting from her scheme to defraud, on or about October 13, 2000, One Thousand Six Hundred Forty One Dollars and Twenty Four Cents ($1,641.24) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

Resulting from her scheme to defraud, on or about October 13, 2000, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

Resulting from her scheme to defraud, on or about January 16, 2001, One Thousand Six Hundred Forty One Dollars and Twenty Four Cents ($1,641.24) was disbursed, wired and transferred to Defendant's account at Alabama State University, Montgomery, Alabama.

Resulting from her scheme to defraud, on or about January 16, 2001, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

Resulting from her scheme to defraud, on or about September 19, 2001, One Thousand Nine Hundred Forty Dollars and Zero Cents ($1,940.00) was disbursed, wired and

transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

Resulting from her scheme to defraud, on or about September 19, 2001, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama. All done in violation of Title 18, United States Code, Section 1344.

Count two of the indictment charged that, on or about October 11, 2000, in Montgomery County, within the Middle District of Alabama, Taylor, knowingly made a material false statement for the purpose of influencing the action of Regions Bank, an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, in connection with Defendant's Federal Stafford Loan Master Promissory Note, in that the defendant falsely identified herself as "Bridget Madison" and falsely certified and identified ████████ as her social security number when in truth and fact, as the defendant well knew, her name is Bridget Y. Taylor and her actual social security number is not ██████. All in violation of Title 18, United States Code, Section 1014.

Pursuant to a written plea agreement negotiated by Attorney Kevin Butler, Taylor pleaded guilty to all counts of the Indictment on October 10, 2006. See Exhibit B. After being placed under oath and consenting to having her plea taken by a United States Magistrate Judge, Taylor informed the Court that she was able to understand the proceedings and that her counsel had satisfactorily assisted her in fully understanding the terms of her agreement. See Exhibit C - *Change of Plea Transcript*. A sentencing hearing was held on January 22, 2007. See Exhibit D - *Sentencing Transcript*. On that date, Taylor was sentenced to 30 months imprisonment on each

3

count to run concurrent with each other and with various other cases pending in the State of

Alabama.  A final judgment of conviction and sentence was entered on January 24, 2007.  See

Exhibit E.  On January 25, 2007, Taylor filed a motion for reconsideration.  See Exhibit F.  On

January 26, 2007, her motion was denied.  See Exhibit G.  On February 8, 2007, Taylor again

filed a motion for reconsideration.  See Exhibit H.  On the same date, her motion was denied.

See Exhibit I.  On February 21, 2007, Taylor petitioned the court for permission to transfer to a

"Boot Camp Facility for Women in the State of Texas."  See Exhibit J.  This request was denied

February 22, 2007.  See Exhibit K.

Taylor filed a Motion to Vacate, Set Aside or Correct Sentence on May 7, 2007.  On May

10, 2007, this Court entered an order directing the United States to respond within thirty days.

## II.  CLAIMS RAISED IN THE § 2255 MOTION

As far as the United States can discern, Taylor raises a single issue in her motion under §

2255:

1.    Trial counsel was ineffective for failing to call particular witnesses to testify at Taylor's
      sentencing hearing.

## III.  RESPONSE TO CLAIMS FOR RELIEF

### A.    **Taylor's Motion Is Barred Because She Waived Her Right to Seek Relief Under 28 U.S.C. § 2255 When She Entered Her Guilty Plea.**

Taylor agreed to waive her right to seek relief pursuant to 28 U.S.C. § 2255 when she

entered into her guilty plea agreement on October 10, 2006.  See Exhibit B, at 8.  The transcript

of her guilty plea hearing shows that this Honorable Court reviewed Taylor's waiver of her rights

to appeal her sentence, and to seek post-conviction relief.  See Exhibit C, at 8.  Thus, the record

clearly shows that Taylor was aware of, and understood, her waiver of the right to seek post-

4

conviction relief.

The Eleventh Circuit views Taylor's waiver of her right to seek relief under § 2255 as a contract between the United States and a criminal defendant. United States v. Howle, 166 F.3d 1166, 1168 (11th Cir. 1999). It has held that "a waiver of the right to seek federal habeas review must be 'an intentional relinquishment or abandonment of a known right,' the right to federal habeas review." Allen v. Thomas,161 F.3d 667, 670 (11th Cir. 1998). The record demonstrates that the Court ascertained that Taylor's assent to the terms of her plea agreement was knowing and voluntary. Taylor's § 2255 motion is thus barred from review by this Court.

**B.     Taylor Met The One-Year Statute Of Limitations Deadline For The Filing of Claims Under 28 U.S.C. § 2255.**

The United States notes that Taylor has filed her motion in a timely manner. She filed her motion under § 2255 on May 7, 2007. Paragraph six of 28 U.S.C. § 2255 provides a one-year period of time within which to file a motion under the rule. The applicable provision in this case requires that a movant file her § 2255 motion within one year from "the date on which the judgment of conviction became final."

Judgement was entered on January 24, 2007. Taylor filed her 28 U.S.C. Section 2255 petition on May 7, 2007. It is, therefore, timely.

**C.     Taylor's Ineffective Assistance of Counsel Claim Should Be Rejected Because It Is Without Factual Support.**

Taylor asserts a single claim of ineffective assistance of counsel. Specifically, she claims her constitutional rights were violated because her lawyer failed to call specific witnesses to testify during her sentencing hearing. To succeed on a claim of ineffective assistance of counsel, a defendant must prove both that counsel's performance was deficient and that the deficient

performance prejudiced his case.  Strickland v. Washington, 466 U.S. 668, 694 (1984); see also, Bell v. Cone, 535 U.S. 685, 697-98 (2002) (reaffirming the Strickland v. Washington standard for reviewing ineffective assistance of counsel claims); Caderno v. United States, 256 F.3d 1213, 1217 (11th Cir. 2001) (applying two-part test of Strickland v. Washington).  Simply stated, Taylor must show that, (1) identified acts or omissions of counsel fell below an objective standard of reasonableness, and (2) that her counsel's alleged errors or omissions resulted in prejudice to her to such an extent that, without counsel's alleged errors or omissions, there is a reasonable probability that the outcome of trial would have been different.  Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990).

In analyzing counsel's performance under the performance prong of Strickland, this Court must presume that the conduct of counsel was reasonable, Yordan v. Dugger, 909 F.2d at 477. A "[d]efendant must prove deficient performance by a preponderance of competent evidence, and the standard is 'reasonableness under prevailing professional norms.'" Gallo-Chamorro v. United States, 233 F.3d 1298, 1303-04 (11th Cir. 2000) (footnotes omitted).  The Eleventh Circuit has described a defendant's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:
>
> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ...  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

6

> . . . Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take....

Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations omitted).

The Eleventh Circuit has described a defendant's burden in demonstrating that his counsel's deficient performance prejudiced his case as "high," noting that it is not enough to show that any errors had some conceivable effect on the outcome of the proceeding. Robinson v. Moore, 300 F.3d 1320, 1343-44 (11th Cir. 2002). To succeed on the ineffective assistance of counsel claim, the defendant must show that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.

As the Eleventh Circuit has noted, "[i]t is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." Bottoson v. Moore, 234 F.3d 526, 532 (11th Cir. 2000); accord, Robinson v. Moore, 300 F.3d at 1343. Despite claiming ineffective assistance of counsel, Taylor has failed to plead facts sufficient to demonstrate that her counsel's performance was deficient and/or that she was prejudiced by any of counsel's actions.

Indeed, the gravamen of Taylor's claim rests on her counsel's decision not to call particular witnesses during her sentencing hearing. The Eleventh Circuit, in Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000), addressed a similar issue. Specifically, petitioner argued his counsel was ineffective for failing to investigate and present character witnesses at an evidentiary hearing. See Chandler at 1312. Rejecting this claim, the Eleventh Circuit reasoned:

Counsel is not required to present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy . . . **Considering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others**. (Emphasis added). See Chandler at 1319 (internal citations omitted).

In his affidavit filed by order of this court, counsel for Taylor, Mr. Kevin Butler, states that he did properly consider calling various witnesses. (**See Affidavit of Defense Counsel Attached As Exhibit L**)   In preparation for sentencing, Mr. Butler met with Taylor's family members, friends and acquaintances.  After meeting with them, he identified the most effective and persuasive witnesses.  Indeed, Mr. Butler called four witnesses to testify on Taylor's behalf: Lawrence Taylor, Willa Taylor, Valerie Hasty and Dr. David Ghosty.  Rather than call all possible witnesses, Mr. Butler called the salient witnesses.  Under the circumstances it is clear that counsel's performance was not deficient and that Taylor was not prejudiced by decisions to limit cumulative testimony.  Based upon all of the foregoing, Taylor's ineffective assistance of counsel claims are due to be denied.

## IV.  A HEARING IS NOT NECESSARY IN THIS MATTER

Taylor has not pleaded facts or presented sufficient evidence or argument which, if true, show that she is entitled to an evidentiary hearing, and her claims for relief should be denied without an evidentiary hearing.  See Blacklidge v. Allison, 431 U.S. 63, 73-74 (1977); Tejada v. Dugger, 941 U.S. 1551, 1559 (11th Cir. 1991); United States v. Laetividal-Gonzalez, 939 F. 2d 1455, 1465 (11th Cir. 1991).  Should this Court determine that Taylor has made any arguments not addressed in this response, the United States would request the opportunity to further respond to those arguments.

## V. CONCLUSION

For the above reasons, Defendant/Movant Bridget Y. Taylor has failed to demonstrate that he is entitled to any relief from this Court, and his § 2255 motion should be denied without an evidentiary hearing.

Respectfully submitted this 11th day of July, 2007.

/s/ Verne H. Speirs
VERNE H. SPEIRS
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
verne.speirs@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **BRIDGET Y. TAYLOR** | ) | |
| | ) | |
| **Defendant/Movant,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:07cv404-MHT** |
| | ) | **(CR NO. 2:06cr209-WKW)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have mailed the document by United States Postal Service to the following non-CM/ECF participant: Bridget Y. Taylor, Prisoner Number 224401, Julia Tutwiler Prison for Women, Wetumpka, Alabama 36092.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Verne H. Speirs
VERNE H. SPEIRS
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
verne.speirs@usdoj.gov

AUG 15 2006

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR NO. ___2:06CR209-WKW___ |
| | ) | [18 USC 1344; |
| BRIDGET Y. TAYLOR, | ) | 18 USC 1014] |
| a/k/a BRIDGET MADISON | ) | |
| | ) | INDICTMENT |

The Grand Jury charges::

## COUNT 1

1.    At all times relevant to this Indictment:

a.    The defendant BRIDGET Y. TAYLOR used as an alias a name identified herein as "Bridget Madison."

b.    The defendant BRIDGET Y. TAYLOR used a false social security number, to wit: ████████

2.    In or about October 2000, in Montgomery, Alabama, within the Middle District of Alabama, and elsewhere,

BRIDGET Y. TAYLOR,
a/k/a BRIDGET MADISON,

did knowingly execute and attempt to execute a scheme and artifice to defraud a financial institution and to obtain any of the moneys, funds, credits, assets, securities and other property owned by and under the control of a financial institution by means of false and fraudulent pretenses, representations, and promises, which scheme and artifice consisted of obtaining a student loan from Regions Bank, the deposits of which were insured by the Federal Deposit Insurance Corporation, through the use of a false name and social security number:

> **GOVERNMENT EXHIBIT**
>
> CASE NO.
>
> EXHIBIT NO. A

3.      On or about October 11, 2000, in Montgomery, Alabama, the defendant executed and attempted to execute the above described scheme to and artifice by using and certifying a fictitious name "Bridget Madison" and a false and fictitious social security number, to-wit: ███████ on Federal Family Education Loan Program - Federal Stafford Loan Promissory Note identifying Regions Bank, Mobile, Alabama, as Lender.

4.      Resulting from her scheme to defraud, on or about October 13, 2000, One Thousand Six Hundred Forty One Dollars and Twenty Four Cents ($1,641.24) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

5.      Resulting from her scheme to defraud, on or about October 13, 2000, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

6.      Resulting from her scheme to defraud, on or about January 16, 2001, One Thousand Six Hundred Forty One Dollars and Twenty Four Cents ($1,641.24) was disbursed, wired and transferred to Defendant's account at Alabama State University, Montgomery, Alabama.

7.      Resulting from her scheme to defraud, on or about January 16, 2001, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

8.      Resulting from her scheme to defraud, on or about September 19, 2001, One Thousand Nine Hundred Forty Dollars and Zero Cents ($1,940.00) was disbursed, wired and

transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

9.    Resulting from her scheme to defraud, on or about September 19, 2001, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama. All done in violation of Title 18, United States Code, Section 1344.

<u>COUNT 2</u>

On or about October 11, 2000, in Montgomery County, within the Middle District of Alabama,

BRIDGET Y. TAYLOR,
a/k/a BRIDGET MADISON,

defendant herein, knowingly made a material false statement for the purpose of influencing the action of Regions Bank, an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, in connection with Defendant's Federal Stafford Loan Master Promissory Note, in that the defendant falsely identified herself as "Bridget Madison" and falsely certified and identified ▮▮▮▮▮▮▮ as her social security number when in truth and fact, as the defendant well knew, her name is Bridget Y. Taylor and her actual social security number is not ▮▮▮▮▮▮▮ All in violation of Title 18, United States Code, Section 1014.

3

A TRUE BILL:

*Janice Davis Williams*
Foreperson

*Leura G. Canary*
LEURA G. CANARY
United States Attorney

VERNE H. SPEIRS
Assistant United States Attorney

4

**FILED**

IN THE DISTRICT COURT OF THE UNITED STATES OCT 1 0 2006
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

UNITED STATES OF AMERICA          )
                                  )
            v.                    )      CR. NO. 2:06CR209-WKW
                                  )
BRIDGET Y. TAYLOR                 )
a/k/a BRIDGET MADISON

**PLEA AGREEMENT**

DEFENSE COUNSEL:              KEVIN BUTLER

ASSISTANT U.S. ATTORNEY:      VERNE H. SPEIRS

**COUNT AND STATUTE CHARGED:**

Count 1          <u>18 U.S.C. § 1344</u>
                 Bank Fraud

Count 2          <u>18 U.S.C. § 1014</u>
                 Loan and Credit Fraud

**COUNT PLEADING PURSUANT TO PLEA AGREEMENT:**

Count 1          18 U.S.C. § 1344

Count 2          18 U.S.C. § 1014

**PENALTIES BY COUNT – MAXIMUM PENALTY:**

Count 1          <u>18 U.S.C. § 1344</u>
                 NMT 30 years;
                 Fine: NMT $1,000,000;
                 Special Assessment: $100;
                 Supervised Release: NMT 5Y;
                 VWPA

Count 2          <u>18 U.S.C. § 1014</u>
                 NMT 30 years;
                 Fine: NMT $1,000,000;
                 Special Assessment: $100;
                 Supervised Release: NMT 5Y;
                 VWPA

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.  B

**ELEMENTS OF THE OFFENSE:**

<u>18 U.S.C. § 1344</u>

1.    Defendant knowingly executed a scheme to defraud a financial institution and obtain money under the custody and control of a financial institution by means of false and fraudulent representations;

2.    Defendant did so with intent to defraud; and,

3.    Financial institutions was insured by the United States Government.

<u>18 U.S.C. § 1014</u>

1.    That the defendant knowingly made a false statement or report to the financial institution described in the indictment;

2.    That the deposits of the institution were FDIC insured;

3.    That the defendant made the false statement or report willfully and with intent to influence the action of the institution upon an application, advance, commitment or loan or any change or extension thereof.

*******************************************************************

Verne H. Speirs, Assistant United States Attorney and Kevin Butler, attorney for the defendant, pursuant to Rule 11(c)(1)(C) and 11(c)(1)(A), Federal Rules of Criminal Procedure, as Amended, have, with the authorization of the undersigned defendant, heretofore entered into discussions with a view towards reaching a pretrial conclusion of the charges pending in the Indictment herein and a Plea Agreement has been reached by said parties. The plea is being submitted to the Court pursuant to Federal Rules of Criminal Procedure 11(c)(1)(C) and 11(c)(1)(A), and the parties understand that, if the terms of the Plea Agreement are

not accepted by the Court, the defendant will be allowed to
withdraw the defendant's plea of guilty and proceed to trial.  If
the Court accepts this agreement, however, and defendant
thereafter breaches this agreement, her guilty plea may not be
withdrawn.

## GOVERNMENT'S PROVISIONS

1. Upon entering a plea of guilty by the defendant to the
offense charged in Counts 1 and 2 of the Indictment, the attorney
for the Government will do the following:

a.  The Government will agree that a 2-level reduction
in the applicable offense level pursuant to U.S.S.G. § 3E1.1(a)
for the defendant's acceptance of responsibility is appropriate,
so long as the defendant does not obstruct justice or otherwise
fail to accept responsibility for the offense conduct.  Should
the Government find the defendant assisted authorities in the
investigation or prosecution of the defendant's own misconduct by
timely notifying authorities of the defendant's intention to
enter a plea of guilty, thereby permitting the Government to
avoid preparing for trial and permitting the Government and this
Court to allocate their resources efficiently, and if Defendant
otherwise qualifies, the Government will move at sentencing for a
further reduction of one level, pursuant to U.S.S.G. § 3E1.1(b).
Determination of whether the defendant met the defendant's

obligations to qualify for the reduction pursuant to U.S.S.G. §
3E1.1 is at the sole discretion of the United States.

　　　　b.　The government will agree that any sentence imposed
by the United States District Court for the Middle District of
Alabama should run concurrent to any time remaining on
defendant's State sentence for similar or related fraud charges.
It is the express intent of the parties that once defendant
finishes her State sentence, she serve the remainder of her
federal sentence in federal custody.

　　　　c.　The government will agree not to contest a sentence
in the mid-range of the applicable Guideline Level as determined
and calculated by United State Probation, Middle District of
Alabama and applied by the United States District Court for the
Middle District of Alabama.　In support thereof, the United
States acknowledges that defendant has sought a swift resolution
of the instant case and has thereby saved the United States time
and resources.

　　　　d.　The government will agree, pursuant to rule
11(c)(1)(A), Federal Rules of Criminal Procedure not to seek any
additional charges for relating to Social Security Fraud.　This
provision is strictly limited to criminal events occurring in or
about October 2000, within the Middle District of Alabama.　This
provision shall have no force and effect in any other
jurisdiction of the United States and is not intended to limit

4

any other investigation or prosecution (known or unknown) by any other investigating or prosecuting entity whatsoever.

2. The United States reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses and the defendant's background.

## DEFENDANT'S PROVISIONS

3. The defendant agrees to the following:

    a.    To plead guilty to Counts 1 and 2 of the Indictment.

    b.    To make full financial restitution to any and all victims as determined and calculated by United States Probation, Middle District of Alabama. **The amount of restitution shall be no less than $9,040.31.**

    c.    Not commit any State, local or federal offenses.

## FACTUAL BASIS

In or about October 2000, in Montgomery, Alabama, within the Middle District of Alabama, and elsewhere, BRIDGET Y. TAYLOR, a/k/a BRIDGET MADISON, did knowingly execute and attempt to execute a scheme and artifice to defraud a financial institution and to obtain any of the moneys, funds, credits, assets, securities and other property owned by and under the control of a financial institution by means of false and fraudulent pretenses, representations, and promises, which scheme and artifice consisted of obtaining a student loan from Regions Bank, the

deposits of which were insured by the Federal Deposit Insurance Corporation, through the use of a false name and social security number, specifically:

On or about October 11, 2000, in Montgomery, Alabama, the defendant executed and attempted to execute the above described scheme to and artifice by using and certifying a fictitious name "Bridget Madison" and a false and fictitious social security number, to-wit: ▮▮▮▮▮▮▮, on Federal Family Education Loan Program - Federal Stafford Loan Promissory Note identifying Regions Bank, Mobile, Alabama, as Lender.

1.    Resulting from her scheme to defraud, on or about October 13, 2000, One Thousand Six Hundred Forty One Dollars and Twenty Four Cents ($1,641.24) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

2.    Resulting from her scheme to defraud, on or about October 13, 2000, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

3.    Resulting from her scheme to defraud, on or about January 16, 2001, One Thousand Six Hundred Forty One Dollars and Twenty Four Cents ($1,641.24) was disbursed, wired and transferred to

Defendant's account at Alabama State University, Montgomery, Alabama.

4.    Resulting from her scheme to defraud, on or about January 16, 2001, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

5.    Resulting from her scheme to defraud, on or about September 19, 2001, One Thousand Nine Hundred Forty Dollars and Zero Cents ($1,940.00) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

6.    Resulting from her scheme to defraud, on or about September 19, 2001, One Thousand Two Hundred Seventy Two Dollars and Sixty One Cents ($1,272.61) was disbursed, wired and transferred on behalf of Regions Bank to Defendant's account at Alabama State University, Montgomery, Alabama.

Furthermore, on or about October 11, 2000, in Montgomery County, within the Middle District of Alabama, BRIDGET Y. TAYLOR, a/k/a BRIDGET MADISON, defendant herein, knowingly made a material false statement for the purpose of influencing the action of Regions Bank, an institution the accounts of which are insured by the Federal Deposit Insurance Corporation, in connection with Defendant's Federal Stafford Loan Master

Promissory Note, in that the defendant falsely identified herself as "Bridget Madison" and falsely certified and identified ▮▮▮▮▮ ▮▮▮▮ as her social security number when in truth and fact, as the defendant well knew, her name is Bridget Y. Taylor and her actual social security number is not ▮▮▮▮▮▮▮▮.

### DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

Understanding that 18 U.S.C. § 3742 provides for appeal by a defendant of the sentence under certain circumstances, the defendant expressly waives any and all rights conferred by 18 U.S.C. § 3742 to appeal the sentence.  Defendant further expressly waives the right to appeal the sentence on any other ground and waives the right to attack the sentence in any post-conviction proceeding.

The government does not waive its right to appeal any order dismissing the Indictment, vacating a sentence, or otherwise terminating the prosecution at any stage of the proceedings.  Further, the parties agree that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b).

### DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT

4.  The defendant, before entering a plea of guilty to Counts 1 and 2 of the Indictment as provided for herein by said Plea Agreement, advises the Court that:

8

a.  The discussions between the attorney for the government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent.

b.  Defendant acknowledges that a breach of this federal plea agreement will not entitle him to withdraw his guilty plea in this case.  Defendant understands and acknowledges that defendant's guilty plea will remain in full force and effect upon any breach of this agreement by the defendant.

c.  The defendant further understands that, pursuant to 18 U.S.C. § 3013, said $100.00 assessment fee is to be paid by the defendant on the date of sentencing.  The defendant will make an honest, good faith effort to pay said fee as directed by the Financial Litigation Section of the United States Attorney's Office.  The defendant further understands that by completing the financial statement, the defendant is representing that it is true and accurate to the best of the defendant's information, knowledge, and belief.

d.  The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney.

e.  The defendant understands that the defendant has the right to plead not guilty and has the right to be tried

by a jury and, at a trial thereof, has the right to the
assistance of counsel, the right to confront and cross-examine
witnesses against the defendant, the right to call witnesses in
the defendant's own behalf, and the right not to be compelled to
incriminate the defendant, and that if the defendant enters a
plea of guilty herein, there will not be a further trial of any
kind and that by the entry of such a plea, the defendant waives
the right to a trial by jury or to a trial before the Court.

    f.  The defendant further understands that in
entering a plea of guilty herein, the Court may ask questions
about the offense to which the plea is entered and further
understands that if the defendant answers these questions under
oath, on the record, and in the presence of counsel, which
questions and answers would be recorded, that the answers may
later be used against the defendant in a prosecution for perjury
or false statement if the answers are not truthful.

    g.  The Defendant further understands and advises
the Court that the Plea Agreement as set forth herein and the
plea to be entered by the defendant as a result thereof is
voluntary on the defendant's part and is not the result of any
force or threats or of any promises apart from the aforesaid Plea
Agreement.  The defendant further advises the Court that the Plea
Agreement set forth herein is the result of prior discussions
between the attorney for the government and the attorney for the

10

defendant, all conducted with the defendant's authorization, knowledge, and consent.

h. The defendant further advises the Court that the defendant's understanding of this Plea Agreement is as set forth in this document.

i. The defendant further advises the Court that it is understood that the government can only make a recommendation which is not binding on the Court.

j. The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant. However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Indictment herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel.

k. The defendant is satisfied that defense counsel has been competent and effective in representing defendant.

11

5.  The undersigned attorneys for the government and for the defendant represent to the court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11, Federal Rules of Criminal Procedure, as Amended.  The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind.  Further, the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

12

6.    The defendant understands that the U.S. Probation Office will prepare a presentence investigation report for the Court.  The Probation Officer will consider the defendant's conduct related to the offense to which the plea is offered, as well as the defendant's criminal history.  The offense level or criminal history category, as calculated by the Probation Officer and determined by the court, may differ from that projected by defendant's counsel or the U.S. Attorney.  In the event that the Court determines the defendant's offense level or criminal history category is higher than the defendant anticipated, the defendant will have the right to withdraw the plea on that basis.

This  10th  day of October, 2006.


                    Respectfully submitted,

                    LEURA G. CANARY
                    UNITED STATES ATTORNEY



                    Louis V. Franklin, Sr.
                    Criminal Chief


                    Verne H. Speirs
                    Assistant United States Attorney
                    One Court Square
                    Suite 201
                    Montgomery, Alabama 36104


                    13

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL, Kevin L. Butler.

_____
BRIDGET TAYLOR/DEFENDANT

10/10/06
_____
Date

_____
Kevin Butler
Attorney for the Defendant

10/10/06
_____
Date

14

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA


THE UNITED STATES
OF AMERICA

vs.                              CRIMINAL ACTION NO.
                                 2:06-CR-209-WKW
BRIDGET Y. TAYLOR








CHANGE OF PLEA




* * * * * * * * * *



BEFORE:        The Hon. Charles S. Coody

HEARD AT:      Montgomery, Alabama

HEARD ON:      October 10, 2006

APPEARANCES:   Verne H. Speirs, Esq.
               Kevin L. Butler, Esq.

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT  C
NO.

Page 2

1 WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
THE HON. OCTOBER 10, 2006 AT THE UNITED STATES
2 COURTHOUSE IN MONTGOMERY, ALABAMA.

3

4        THE COURT:  Good morning.

5        We're here in United States vs. Taylor, two

6 thousand five two oh nine for the purpose of a change of

7 plea.  Miss Taylor, previously you have entered a plea

8 of not guilty to the charges against you.  Is it correct

9 that you now desire to change your plea?

10        THE DEFENDANT:  Yes, sir.

11        THE COURT:  For that purpose you must be

12 placed under oath.  Please raise your right hand and be

13 sworn.

14        (Whereupon, the defendant was duly sworn.)

15        THE COURT:  Miss Taylor, let me remind you

16 that you now are under oath and if you answer falsely

17 any of the questions put to you by either the Court or

18 the lawyers during this proceeding, those false answers

19 may later be used against you in a prosecution for

20 perjury or for making a false statement.  Do you

21 understand that?

22 A    Yes.

23        THE COURT:  What is your full name.

24 A    Bridget Yolanda Madison.

25        THE COURT:  How old are you?

Page 3

1 A  Thirty-five.
2     THE COURT:  How far have you gone in school?
3 A  Sixth grade.
4     THE COURT:  Have you recently been treated for
5 mental illness or addiction to narcotic drugs of any
6 kind?
7 A  Mental counseling, but no drugs.
8     THE COURT:  All right.  What kind of
9 counseling have you had?
10 A  When I was with Birmingham Release Center.
11 Counseling.
12     THE COURT:  All right.  Are you currently
13 under the influence of any drugs, medicine, pills or
14 alcoholic beverage?
15 A  No.
16     THE COURT:  Mr. Butler, do you have any doubt
17 about her competency to enter a plea this morning?
18     MR. BUTLER:  None, Your Honor.
19     THE COURT:  Miss Taylor, I'm a United States
20 magistrate judge.  The judge next higher in rank is a
21 United States district judge.  You have the right to
22 have a district judge conduct these proceedings and
23 adjudicate your guilt based on your plea; however, you
24 may consent to my conducting the proceedings this
25 morning.  Have you and Mr. Butler talked about that?

Page 4

1 A  Yes.
2     THE COURT:  Do you wish me to conduct these
3 proceedings?
4 A  Yes.
5     THE COURT:  For that purpose I need you to
6 sign the form that Mr. Butler has before you to indicate
7 your consent.
8     (Whereupon the defendant and her counsel
9 executed said document.)
10     THE COURT:  Miss Taylor, have you received a
11 copy of the indictment or written charges against you in
12 this case?
13 A  Yes, sir.
14     THE COURT:  And have you had a full
15 opportunity to discuss those charges with Mr. Butler,
16 your lawyer?
17 A  Yes, sir.
18     THE COURT:  Do you understand the charges
19 against you?
20 A  Yes, I do.
21     THE COURT:  Are you fully satisfied with Mr.
22 Butler's representation of you in this case?
23 A  Yes.
24     THE COURT:  I have before me a written plea
25 agreement, and I'm turning to page fourteen, which is

Page 5

1 the last page of that agreement.  Miss Taylor, if you'll
2 look up here, that appears to be your signature.  Is it
3 your signatures?
4 A  Yes, it is.
5     THE COURT:  Before signing this plea
6 agreement, did you have an opportunity to read it and to
7 discuss the terms of it with Mr. Butler?
8 A  Yes.
9     THE COURT:  Do you understand the terms of the
10 plea agreement?
11 A  Yes, sir.
12     THE COURT:  Is this the complete agreement
13 between you and the United States?
14 A  Yes, sir.
15     THE COURT:  Other than this plea agreement,
16 has anyone made any promise to you to get you to plead
17 guilty?
18 A  No.
19     THE COURT:  Miss Taylor, the sentencing
20 recommendation in this plea agreement is merely that, it
21 is a recommendation to the Court and the Court is not
22 bound by it.  At a later date the sentencing judge will
23 review the recommendation and decide whether he will
24 follow that recommendation in imposing a sentence on
25 you.  If the sentencing judge decides that he will not

Page 6

1  follow the recommendation, you will be notified of that
2  and at that time you will have the right to withdraw
3  your guilty plea. Do you understand that?
4  A  Yes, sir.
5      THE COURT: At that time if you decide to not
6  withdraw your guilty plea, the Court may then impose on
7  you any lawful sentence, even if it is more severe than
8  the sentence you expect. Do you understand that?
9  A  Yes, sir.
10     THE COURT: Has anyone attempted in any way to
11 force you to plead guilty in this case?
12 A  No.
13     THE COURT: Miss Taylor, the offenses to which
14 you are entering a guilty plea, bank fraud and loan and
15 credit fraud, are felony offenses, and upon conviction
16 of those offenses you may be deprived of valuable civil
17 rights such as the right to hold public office, the
18 right to serve on a jury, the right to possess any kind
19 of firearm. Do you understand that?
20 A  Yes, sir.
21     THE COURT: With respect to the bank fraud and
22 the loan and credit fraud charges, which are counts one
23 and count two, the maximum punishment for those offenses
24 is a term of imprisonment of not more than thirty years,
25 a fine of not more than one million dollars or both the

Page 7

1  fine and the imprisonment. Upon release from
2  imprisonment you would be subject to a period of
3  supervised release of not more than five years. You
4  would be required to pay a one hundred dollar assessment
5  fee to the Court as to each of the two counts, and you
6  would be made to pay restitution to the victim of the
7  crime.
8      Do you understand the punishment for those
9  offenses?
10 A  Yes, sir.
11     THE COURT: Miss Taylor, if sentenced to a
12 term of imprisonment, when you are released on
13 supervised release, should you violate the conditions of
14 supervised release you can be given additional time in
15 prison. Do you understand that?
16 A  Yes, sir.
17     THE COURT: Now have you and Mr. Butler talked
18 about the sentencing guidelines and how they apply in
19 your case?
20 A  Yes.
21     THE COURT: Miss Taylor, the sentencing
22 guidelines are no longer mandatory, but they remain an
23 important factor which the Court must consider in
24 imposing a reasonable sentence on you. Do you
25 understand that?

Page 8

1  A  Yes, sir.
2      THE COURT: If sentenced to a term of
3  imprisonment you will not be released on parole because
4  parole has been abolished. Do you understand that?
5  A  Yes.
6      THE COURT: Under the terms of this plea
7  agreement, Miss Taylor, you are giving up any and all
8  rights that you have to appeal or otherwise attack any
9  sentence imposed on you for any reason whatsoever.
10 After you are adjudicated guilty and a sentence has been
11 imposed on you, you will not be able to appeal, you will
12 not be able to file any kind of postconviction motion.
13 Do you understand that?
14 A  Yes, sir.
15     THE COURT: Miss Taylor, to these charges,
16 counts one and counts two of the indictment, you have
17 the right to plead not guilty and to persist in that
18 plea. You would then have the right to a trial by jury,
19 of which you would be presumed innocent and the
20 Government would be required to prove your guilt beyond
21 a reasonable doubt.
22     At that trial you would have the right to the
23 assistance of counsel for your defense, the right to see
24 and hear all witnesses and have them cross examined in
25 your defense, and you would have the right on your own

Page 9

1  part to decline to testify unless you voluntarily
2  elected to do so in your defense, and you would have the
3  right to issue subpoenas to compel witnesses to come to
4  court to testify in your defense.
5      Miss Taylor, do you understand your right to a
6  trial and the other rights that I've explained to you?
7  A  Yes, sir.
8      THE COURT: At that trial if you decided to
9  not put on any evidence or to not testify, those facts
10 could not be used against you. Do you understand that?
11 A  Yes, sir.
12     THE COURT: Miss Taylor, by pleading guilty
13 you are giving up your right to a trial and the other
14 rights that I've explained to you. Based on your plea
15 of guilty the Court will find you guilty, there will be
16 no trial of any kind. Do you understand that?
17 A  Yes, sir.
18     THE COURT: At a trial on these charges the
19 Government would be required to prove beyond a
20 reasonable doubt certain facts. With respect to the
21 charge of bank fraud, the Government would be required
22 to prove that you knowingly executed a scheme to defraud
23 a financial institution and obtain money under the
24 custody and control of that financial institution by
25 being means of false and fraudulent representations, and

Page 10

1 that you did those actions with intent to defraud and
2 that the financial institution was insured by the United
3 States Government.
4      Do you understand what the Government would be
5 required to prove before you could be found guilty of
6 count one?
7 A Yes.
8      THE COURT: With respect to count two, you
9 could not be found guilty unless the Government proved
10 beyond a reasonable doubt that you knowingly made a
11 false statement or report to a financial institution as
12 described in the indictment. That the deposits of that
13 institution were insured by the Federal Deposit
14 Insurance Corporation, and that you made the false
15 statement or report willfully and with the intent to
16 influence the action of the institution upon putting an
17 application for a loan or any change or extension of the
18 loan.
19      Do you understand there what the Government
20 would be required to prove beyond a reasonable doubt?
21 A Yes, sir.
22      THE COURT: Before I can accept your guilty
23 plea, Miss Taylor, I must be satisfied there is a
24 factual basis for it.
25      Mr. Butler, will you assist the Court by

Page 11

1 asking her the appropriate questions?
2      MR. BUTLER: Yes, Your Honor. For both
3 purposes of count one and two, if this matter had
4 proceeded to trial, the Defense would have stipulated
5 that all fraudulent activity and false statements
6 involved Regions Bank, and that Regions Bank is F. D. I.
7 C. insured.
8      THE COURT: All right.
9      MR. BUTLER: Given that stipulation, the
10 following facts happened. Miss Taylor, on or about
11 October two thousand, using the name Bridget Madison,
12 which is your maiden name, you applied for student loans
13 with Regions Bank, is that not correct?
14 A Yes, that's correct.
15      MR. BUTLER: When you made those applications
16 you knowingly used false Social Security numbers?
17 A Yes.
18      MR. BUTLER: At the time you used those false
19 Social Security numbers, it was your intent to
20 fraudulently obtain student loans from Regions Bank.
21 A Yes.
22      MR. BUTLER: As a result of your applications
23 knowingly using false Social Security numbers, you
24 obtained approximately nine thousand forty dollars and
25 thirty-one cents from Regions Bank.

Page 12

1 A Yes.
2      MR. BUTLER: You knowingly received this money
3 using false Social Security numbers.
4 A Yes.
5      MR. BUTLER: Your Honor, I believe those facts
6 actually cover both counts.
7      THE COURT: Does the Government agree?
8      MR. SPEIRS: One second, Your Honor.
9      I think it's important to note that on October
10 eleventh of two thousand that Miss Madison indeed
11 executed a promissory note wherein she falsely certified
12 and identified a Social Security number, three hundred
13 dash seventy dash eight five zero zero as her Social
14 Security number when in fact that was not accurate.
15      MR. BUTLER: Is that correct?
16 A That's correct.
17      MR. SPEIRS: And that she in approximately six
18 different occasions received checks that were sent to
19 her account at Alabama State University with various
20 funds that totaled about nine thousand dollars.
21      MR. BUTLER: Right.
22      MR. SPEIRS: With that, Your Honor, the
23 Government would be more satisfied.
24      MR. BUTLER: And is that not correct?
25 A That is correct.

Page 13

1      THE COURT: All right. Miss Taylor, I have
2 told you the rights which you have and the rights which
3 you give up by pleading guilty to these charges. Is it
4 still your desire to plead guilty to both count one and
5 count two of the indictment?
6 A Yes, sir.
7      THE COURT: Miss Taylor, to count one of the
8 indictment charging you with bank fraud how do you
9 plead?
10 A Guilty.
11      THE COURT: Miss Taylor, with respect to count
12 two of the indictment charging you with loan and credit
13 fraud how do you plead?
14 A Guilty.
15      THE COURT: Miss Taylor, the Court finds that
16 you are fully competent and capable of entering an
17 informed plea, that you are aware of the nature of the
18 charges against you and the consequences of your plea.
19 I further find that your plea of guilty is a knowing and
20 voluntary plea supported by an independent basis in fact
21 containing each of the essential elements of the
22 offenses. Your plea is therefore accepted, and you are
23 now adjudicated guilty of the offenses of count one and
24 count two of the indictment.
25      Sentencing will be set at later date.

Page 14

1    Of course you will remain in custody.
2    MR. BUTLER: Your Honor, just for the record,
3  and so Probation is aware, Miss Taylor is currently
4  serving time in the state of Alabama. I believe there
5  may be a state probation report available. We're going
6  to request that if at all possible, that we expedite the
7  P. S. I. We may even waive objections if everything
8  comes through quickly.
9    THE COURT: Anything further?
10    MR. SPEIRS: Not from the Government.
11    MR. BUTLER: Thank you.
12    THE COURT: All right. We're in recess.
13    (Whereupon, the proceedings were concluded.)
14
15
16
17
18
19
20
21
22              -o0o-
23
24
25

Page 15

1              * * * * * * * * * *
2
3
4              COURT REPORTER'S CERTIFICATE
5
6        I certify that the foregoing is a correct
7  transcript from the record of proceedings in the
8  above-entitled matter as prepared by me to the best of
9  my ability.
10
11        I further certify that I am not related to any
12  of the parties hereto, nor their counsel, and I have no
13  interest in the outcome of said cause.
14
15        Dated this 15th day of May X 2007.
16
17              /s/ Mitchell P. Reisner
              MITCHELL  P.  REISNER,  CM,  CRR,
18              Official US Dist. Court Reporter
              Registered Professional Reporter
19              Certified   Real-Time   Reporter
20
21
22
23
24
25

**MITCHELL P. REISNER, CM, CRR - (334) 265-2500**
**Total Computerized Litigation Support**                    Page 14 - Page 15

IN THE UNITED STATES DISTRICT COURT
FOR
THE MIDDLE DISTRICT OF ALABAMA


THE UNITED STATES
OF AMERICA

      vs.                       CRIMINAL ACTION NO.
                                  2:06-CR-209-WKW

BRIDGET Y. TAYLOR


SENTENCING PROCEEDINGS


\* \* \* \* \* \* \* \* \* \*


BEFORE:          The Hon. Myron H. Thompson

HEARD AT:        Montgomery, Alabama

HEARD ON:        January 22, 2007

APPEARANCES:     Verne H. Speirs, Esq.
                  Kevin L. Butler, Esq.

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.

Page 2

T A B L E   O F   C O N T E N T S

ITEM DESCRIPTION                                    PAGE NO.

Title Page ........................................    1
Table of Contents .............................    2
Preliminary Discussion ...................    3
Lawrence Taylor - Direct Examination
       by Mr. Butler .........................    41
Lawrence Taylor - Cross Examination
       by Mr. Speirs .........................    50
Willia Taylor - Direct Examination
       by Mr. Butler .........................    52
Willia Taylor - Cross Examination
       by Mr. Speirs .........................    64
Valerie Hasty - Direct Examination
       by Mr. Butler .........................    66
Valerie Hasty - Cross Examination
       by Mr. Speirs .........................    74
David Ghostley - Direct Examination
       by Mr. Butler .........................    83
David Ghostley - Cross Examination
       by Mr. Speirs .........................    92
David Ghostley - Redirect Examination
       by Mr. Butler .........................    94
David Ghostley - Recross Examination
       by Mr. Speirs .........................    101
Closing Arguments ...........................    102
Oral Decision from the Bench ..........    126
Court Reporter's Certification ...........    136

Page 3

WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HEARD BEFORE
THE HON. MYRON H. THOMPSON ON JANUARY 22, 2007 AT THE

UNITED STATES COURTHOUSE IN MONTGOMERY, ALABAMA:

PRELIMINARY DISCUSSION:

MR. BUTLER: Your Honor, before proceeding Miss Taylor would like to thank the Court for switching sentencing proceedings on such short notice.

THE COURT: That's fine.

The Court calls the case of United States of America vs. Bridget Y. Taylor, criminal number zero six C R two oh nine M. H. T.

Will the defendant stand at the lectern, please.

Now, this is Ms. Taylor, is that correct?

MR. BUTLER: That is correct, Your Honor.

THE COURT: Now Ms. Taylor, have you and your attorney reviewed the Presentence Report, including any revisions that may have been made after the initial disclosure?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now was there a plea in this case?

MR. BUTLER: There was, Your Honor.

THE COURT: Was there a plea agreement?

MR. BUTLER: There was, Your Honor.

THE COURT: And what is the plea agreement?

Page 4

MR. BUTLER: Pursuant to the plea agreement, Your Honor, Miss Taylor had entered a plea of guilty to counts one and two charged in the indictment. Count one was bank fraud; count two was loan and credit card fraud. The plea was entered into pursuant to eleven C one C and eleven C one A. Pursuant to the terms of the plea agreement, the Government will recommend, and I'll summarize this, three levels for acceptance of responsibility, assuming Miss Taylor continues to maintain her acceptance of responsibility and avoid requiring the Government to commit time and resources for trial and did not break any further laws.

The Government would recommend that any sentence imposed by this Court should run concurrent to any time remaining with the state sentence for similar related fraud charges. It is the parties' understanding that regardless of what portion is run concurrent, once she is done or completed finishing her state sentence the remainder of her time would be served in federal custody.

The Government is recommending a sentence in the mid range of the applicable guidelines based on her desire to resolve the case quickly.

And pursuant to eleven C one A, the Government has agreed not to bring any further Social Security

Page 5

charges relating to conduct by Miss Taylor on or about October of two thousand.

THE COURT: Okay.

MR. BUTLER: Your Honor, Miss Taylor entered a plea guilty to counts one and two, and agreed to pay restitution in the amount of nine thousand forty dollars and thirty-one cents.

One final thing, Your Honor. Miss Taylor waived appeal.

THE COURT: Yes?

MR. SPEIRS: Your Honor, that's substantially accurate, although there are I think some things that the Government needs to point out. First of all, which is the Government's obligation to move to the third point would only engage if she qualified for the third point, and it doesn't appear she qualifies for the full three points.

And, Your Honor, the defendant's provision as far as the amount of restitution, it is no less than nine thousand forty dollars, and it may became salient within a few minutes, Your Honor, that that number that she agrees to pay back was what was calculated and determined by United States Probation.

THE COURT: Okay. Now Probation, what's your position on the plea agreement? Is it acceptable under

Page 6

1 the Sentencing Reform Act?
2      THE PROBATION OFFICER: The plea agreement is
3 acceptable, sir, but there are just two items that are
4 in question which from Mr. Speirs has already spoken of.
5 One was the restitution, and the other was concurrent
6 sentencing for any state sentence for similar or related
7 charges. So that would become an issue later on in
8 sentencing.
9      THE COURT: Now the plea agreement says "no
10 less than nine thousand dollars."
11      THE PROBATION OFFICER: That is correct.
12      THE COURT: And what is this about concurrent
13 sentencing? What are you saying with regard to that?
14      THE PROBATION OFFICER: There is a clause in
15 the plea agreement that states the Government will agree
16 to a concurrent sentence for similar or related fraud
17 charges, and I believe that is going to be one of Mr.
18 Butler's objections.
19      THE COURT: Okay, very good.
20      Now you do have objections to the Presentence
21 Report?
22      MR. BUTLER: Yes I do, Your Honor.
23      THE COURT: The first one is that apparently
24 Probation attributed more than thirty thousand dollars
25 or less under the relevant conduct provision, is that

Page 7

1 correct?
2      MR. BUTLER: Yes, Your Honor. Probation's
3 calculation is between thirty and seventy thousand
4 dollars as far as the amount of loss involved.
5      THE COURT: How much?
6      MR. BUTLER: Between thirty and seventy
7 thousand dollars.
8      THE COURT: And that has affected her offense
9 level?
10      MR. BUTLER: Exactly.
11      THE COURT: Okay. I've read your objections
12 there. Do you have anything to add?
13      MR. BUTLER: Your Honor, we would ask that
14 that proof be put on. What representations in the P. S.
15 I., the Presentence Report are not proof. We would ask
16 that figure be established by a preponderance of the
17 evidence.
18      MR. SPEIRS: Your Honor, I think that borders
19 on perhaps a breach of what she agreed to in the plea
20 agreement.
21      THE COURT: What did she agree to in the plea
22 agreement?
23      MR. SPEIRS: She agreed to make full financial
24 restitution to any and all victims as determined and
25 calculated by United States Probation. United States

Page 8

1 Probation has come up with a figure.
2      THE COURT: What is Probation's figure?
3      MR. SPEIRS: Your Honor, I believe Probation's
4 figure should be in the neighborhood of about sixty-one
5 thousand dollars.
6      THE PROBATION OFFICER: That is correct. It's
7 between thirty and seventy thousand dollars.
8      THE COURT: What, specifically, have you
9 calculated the amount that you think she should be held
10 accountable for in restitution?
11      THE PROBATION OFFICER: Now I only calculated
12 approximately nine thousand forty-two dollars of
13 restitution based on the count of conviction, which
14 covers October two thousand student loans, fraudulent
15 student loans from Regions Bank. That's restitution.
16      The impact on the amount of loss is thirty to
17 seventy thousand dollars based on all acts committed by
18 Ms. Taylor since nineteen ninety-three on through to two
19 thousand.
20      THE COURT: Why are you holding her, according
21 to you, only accountable for nine thousand dollars?
22      THE PROBATION OFFICER: The count of
23 conviction involves October two thousand student loans
24 made in various names and Social Security numbers by Ms.
25 Taylor, and the document that I have in my hand signed

Page 9

1 by R. Catherine Snelly, which I will hand over to the
2 Government and Defense counsel, totals nine thousand
3 forty-two dollars and thirty-four cents.
4      THE COURT: Are you saying that under the
5 guidelines she can only be held accountable for the nine
6 thousand?
7      THE PROBATION OFFICER: I'm saying --
8      MR. BUTLER: That's my position.
9      THE PROBATION OFFICER: Our amount of loss is
10 different for restitution.
11      THE COURT: For restitution you're saying she
12 can only be held accountable for nine thousand?
13      THE PROBATION OFFICER: That is correct.
14      THE COURT: Why is that?
15      THE PROBATION OFFICER: Because of the count
16 of conviction. It drives the restitution. And the
17 count of conviction as I'm reading it, which may be
18 improper reading and interpretation, is in regard to the
19 October two thousand loans from Regions Bank.
20      THE COURT: So you're saying that she cannot
21 be held accountable for restitution of, say, forty
22 thousand dollars which the victims I believe requested
23 in restitution?
24      THE PROBATION OFFICER: Outside of the October
25 two thousand time frame, and outside of the Regions

Page 10

1 Bank's losses.
2        THE COURT: What's the Government position on
3 that?
4        MR. SPEIRS: Your Honor, we would concur with
5 Probation's calculation as far as restitution is
6 concerned.
7        THE COURT: So you're saying that as far as
8 restitution is concerned, she can only be held
9 accountable for nine thousand dollars? It's actually
10 nine thousand and forty dollars and thirty-one cents.
11        MR. SPEIRS: Whatever their number as far as
12 restitution is, Your Honor, we will not contest that. I
13 think because we agreed to the determination that
14 Probation made in the plea agreement. Now the plea
15 agreement says --
16        THE COURT: What in the guidelines limit
17 restitution to just the amount reflected in the count of
18 conviction?
19        THE PROBATION OFFICER: Actually, sir, I
20 believe it's in the statutory code book, which I don't
21 have in front of me.
22        THE COURT: Would you cite that to me?
23        THE PROBATION OFFICER: It's going to be under
24 Eighteen U. S. C., Section thirty-six sixty-three.
25        THE COURT: I understand you're drawing a

Page 11

1 distinction between restitution and loss.
2        MR. BUTLER: That's correct.
3        THE COURT: We'll get to the loss factor in a
4 minute. I want to do restitution for now.
5        THE PROBATION OFFICER: And I may be
6 misquoting. Back in nineteen ninety-four there was case
7 law, if either of the two counsel will remember, of
8 Rimalong (ph.), but that was set forth. The only
9 further description in the statute is under Eighteen
10 U.S.C. thirty-six sixty-three under A one A which talks
11 about the Court ordering restitution to persons outside
12 of the conviction count, if it is permissible by plea
13 agreement. So it would be needed to be in the plea
14 agreement further. Thirty-six sixty-three A one A.
15        THE COURT: But absent a plea agreement,
16 you're saying there can be restitution -- Let me restate
17 that. Absent a plea agreement, restitution cannot
18 exceed the count of conviction?
19        THE PROBATION OFFICER: It cannot. It would
20 need to be outlined in the plea agreement. Now that
21 goes on to the two counsel's frame of mind when they
22 fashion a plea agreement and they stated therefore she
23 will agree to any amount determined by the probation
24 officer. And that is left up to the parties that
25 fashioned that plea agreement as to what exactly

Page 12

1 meant when they wrote it.
2        THE COURT: Yes?
3        MR. SPEIRS: Your Honor, and just so that
4 we're clear, Section B does say "restitution". It does
5 not say amount of loss, so I wanted to make that clear,
6 that the Government did not say anything about amount of
7 loss. It did say restitution.
8        THE COURT: Okay.
9        MR. BUTLER: Your Honor, and I would ask or
10 direct the Court to the case of Huey versus United
11 States, four ninety-five U. S. four eleven. It kind of
12 is on point holding that restitution is only authorized
13 for the loss caused by the specific conduct that was the
14 basis for the offense of conviction. I think that
15 supports Probation's argument essentially, that being
16 that the basis for conviction in this case is the
17 offenses set forth in the indictment and pled to by
18 Miss Taylor. Therefore, the amount of restitution that
19 can be ordered in this case is limited to that.
20        THE COURT: Which would be the nine thousand?
21        MR. BUTLER: Nine thousand.
22        THE COURT: Nine thousand forty dollars. I
23 was rounding it off.
24        MR. BUTLER: Yes, Your Honor.
25        THE COURT: Okay. Now with regard to the

Page 13

1 issue of loss, Probation has calculated that to be
2 between thirty and seventy thousand dollars?
3        THE PROBATION OFFICER: That is correct, sir.
4        THE COURT: And that would therefore raise her
5 offense level?
6        THE PROBATION OFFICER: Yes, sir, it would, by
7 seven -- six levels, forty-four thousand five hundred
8 sixty-five dollars and thirty-four cents.
9        THE COURT: And you're asking for proof on
10 that?
11        MR. BUTLER: Yes, Your Honor. It's the
12 Government's contention that that is or may be some form
13 or borders on a violation of the plea agreement. It's
14 our position just the opposite, that is, Your Honor,
15 yes, it is our position that if the amount of loss is
16 accurately calculated, we can't object to it. But it is
17 our position that that amount of loss has been
18 inaccurately calculated, especially in light of the
19 language contained in United States sentencing
20 guidelines section one B one point three, the relevant
21 conduct.
22        It states that -- Well -- and I summarize,
23 that is the amount of loss that is to be applied in this
24 case is the amount of loss that occurred during the
25 commission of the offense of conviction in preparation

Page 14

1  of that offense or in the course of attempting to avoid
2  detection and responsibility for that offense. The
3  offense charged in this case is as outlined in the
4  indictment. It involves student loan fraud and Social
5  Security fraud in the year two thousand, in which the
6  victim, Regions Bank, provided monies to Miss Taylor as
7  a result of her fraudulent conduct.
8       First and foremost, we accept responsibility
9  for that. We're not trying to deny that. The offense
10  of conviction, however, does not reference the
11  additional essentially thirty-five thousand dollars
12  Probation has asked the Court to consider as loss, and
13  is referenced in paragraphs five, six and seven of the
14  plea agreement. It is our position, therefore, under
15  the guidelines this is an inappropriate calculation of
16  loss.
17       By way of simple hypothetical, Your Honor, had
18  Miss Taylor been involved in credit card fraud at this
19  time, that is she was using -- stealing people's credit
20  cards, try to get money for student loans -- I mean for
21  tuition, that is separate criminal conduct. That could
22  not be included in the amount of loss calculation in
23  this offense. In this case, the Government is -- or
24  Probation is recommending that criminal conduct that
25  took place being back to I believe back to nineteen

Page 15

1  ninety-three be used as amount of loss. Essentially,
2  they're throwing everything in the kitchen sink in
3  connection with --
4       THE COURT: Can you all agree on the conduct
5  that's at issue, and does the Court just have to
6  determine whether it's relevant conduct within the
7  meaning of one B one point three, or are you asking that
8  the Government actually prove this other conduct?
9       MR. BUTLER: I see. It is our position, Your
10  Honor -- May I have one Moment with Miss Taylor?
11       THE COURT: Yes.
12       (Whereupon, Mr. Butler conferred with the
13  defendant off the record and out of the hearing of the
14  other courtroom participants.)
15       MR. BUTLER: Yes, Your Honor, thank you.
16       We are stating that no, the Government does
17  not need to put on proof of that conduct, that being
18  that the conduct alleged took place. It is our position
19  that it is not relevant conduct.
20       THE COURT: Okay. Why don't you, then,
21  describe the conduct to which you all agree and I'll
22  decide if it's relevant.
23       MR. BUTLER: The conduct which we agree, Your
24  Honor, is the conduct which is charged in the indictment
25  and for which she pled guilty.

Page 16

1       THE COURT: I understand that, but also the
2  conduct that you contend is not relevant, what is that
3  conduct? I know you contend that it is not relevant,
4  but what is the conduct at issue?
5       MR. BUTLER: Your Honor, in the probation
6  report the United States probation officer alleges -- I
7  mean asserts without dispute the following took place.
8  During the school term -- This is the last sentence of
9  paragraph five --
10       THE COURT: This is of the Presentence Report?
11       MR. BUTLER: Yes, Your Honor.
12       During the school term nineteen ninety-six
13  slash nineteen ninety-seven, Taylor received a federal
14  Perkins loan in the amount of one thousand five thousand
15  dollars; direct Stafford loan, subsidized and
16  unsubsidized in the amount of three thousand one hundred
17  thirty-five dollars; and a PEL grant in the amount of
18  eight hundred twenty-four dollars, using the name
19  Bridget Madison and Social Security number three hundred
20  oh seven eighty-five eight.
21       Paragraph six, the defendant also applied and
22  received federal student aid under the name of Bridget
23  Madison --
24       THE COURT: Do you agree with the conduct in
25  paragraphs five and six?

Page 17

1       MR. BUTLER: No, Your Honor. We disagree with
2  any conduct other than --
3       THE COURT: No, I'm saying you agree that the
4  conduct occurred, but you don't agree it's relevant
5  conduct.
6       MR. BUTLER: Yes, I'm sorry, Your Honor. We
7  agree that the conduct occurred.
8       THE COURT: And that's five and six?
9       MR. BUTLER: That's correct.
10       THE COURT: And I assume seven, too?
11       MR. BUTLER: That is correct, Your Honor.
12       THE COURT: But you don't agree that it's
13  relevant.
14       MR. BUTLER: That is correct.
15       THE COURT: Now let me hear from the
16  Government. As to five, six, and seven, how is that
17  relevant conduct?
18       MR. SPEIRS: It's relevant conduct because it
19  shows the same course of action that is outlined in the
20  indictment, Your Honor. We have a young woman who has
21  been for years using either false names or false Social
22  Security numbers to get Government loans, either PEL
23  grants or federal, what are called F. F. E. L., federal
24  financial -- Federal Family Education Loans.
25       And, Your Honor, we have an agent here who has

Page 18

1  gone back and who has investigated this case and has
2  found for a course of conduct for a number of years
3  where she had been falsifying these records in order to
4  get federal dollars, Your Honor.
5      MR. BUTLER: We actually don't contest
6  anything the Government has just said. That, however,
7  does not make it relevant conduct under the guidelines.
8      THE COURT: Why not?
9      MR. BUTLER: Your Honor, the guidelines
10 specifically state, "That which is relevant conduct --"
11      THE COURT: What are you reading from?
12      MR. BUTLER: I'm reading from United States
13 sentencing guidelines section one B one point three A --
14 section A.
15      THE COURT: Okay.
16      MR. BUTLER: It's after A one, and --
17      THE COURT: What page?
18      MR. BUTLER: Page twenty-two of my guideline
19 book, Your Honor. I believe we have the same one.
20      THE COURT: Okay. Go ahead.
21      MR. BUTLER: And I'm summarizing. Relevant
22 conduct is conduct, and then I go into this, that
23 occurred during the commission of the offense of
24 conviction in preparation of that offense or in the
25 course of attempting to avoid detection or

Page 19

1  responsibility for that offense.
2      I then go back to my original proposition.
3  The offense of conviction in this case, Your Honor, is
4  bank fraud and Social Security fraud involving the nine
5  thousand forty dollars and with the victim Regions Bank.
6  We do not contest that Ms. Taylor has a substantial
7  criminal history for fraudulent activity, some of which
8  also, as the Government has just pointed out, relates to
9  fraudulent activity in student loans. But the offense
10 of conviction in this case is that which was charged and
11 pled.
12      THE COURT: So you're relying on the provision
13 at the bottom of page twenty-two.
14      And what's Probation's response to that?
15      THE PROBATION OFFICER: The probation
16 officer's response is the Defense has not gone further
17 into the description and definition of "relevant
18 conduct".
19      THE COURT: What else should I be reading?
20      THE PROBATION OFFICER: It goes on further to
21 paragraph two which talks about offenses of a character
22 under which U. S. S. G section three D one point two B
23 would apply, which would be three D one point two D
24 would apply, which would include offenses of a
25 fraudulent or theft nature as calculated under U. S. S.

Page 20

1  G. section two B one point one.
2      That particular section goes further to state
3  that, With respect to offenses of a character for which
4  thirty-one point two D would require a grouping of
5  multiple counts, all acts and omissions described in
6  subdivision one A as Mr. Butler has already defined,
7  that were part of the same course of conduct or common
8  scheme or plan as the offense of conviction as Mr.
9  Speirs has already talked about.
10      The commentary note attached to this
11 particular guideline further states that it does not
12 have to be charged, much less convicted, to be
13 considered in the application of relevant conduct.
14      MR. BUTLER: Briefly by way of response, Your
15 Honor. Using the last example referenced by Probation,
16 I believe it would be relevant conduct had the
17 Government, for instance, charged simply -- let's use --
18 I have the indictment in front of me. Had the
19 Government simply charged, I'm looking on page two
20 paragraph four of the indictment, that is that as a
21 result of Miss Taylor's conduct on October thirteenth,
22 two thousand, one thousand six hundred forty one dollars
23 was dispersed from Regions Bank.
24      Had the indictment stopped there and Probation
25 then determined that there was an additional -- all the

Page 21

1  losses look at references -- paragraphs five through
2  nine also took place in regards to Regions Bank, I
3  believe in that case relevant conduct would -- under one
4  B one point three we would be required to pay the
5  additional loss. What they're doing now, though, is
6  saying separate and distinction criminal conduct that
7  occurred over a, I'll say a five year period of time, is
8  relevant in some way to criminal conduct which was
9  charged in this case --
10      THE COURT: What does three D one point two D
11 say?
12      MR. BUTLER: Your Honor, that's the grouping
13 provision, I believe.
14      THE COURT: That's what she's relying on.
15      MR. BUTLER: And, Your Honor, without
16 referencing it, using my knowledge of three D, that
17 grouping does apply to criminal acts which take place
18 connected to, and in furtherance of, charged criminal
19 conduct.
20      THE COURT: "that were part of the same course
21 of conduct or common scheme."
22      So what you have to show is same course of
23 conduct, scheme or plan, common scheme or plan.
24      MR. BUTLER: But the one thing that even that
25 section references as well as the other -- excuse me,

Page 22

1 that is the section Probation has referenced as well as
2 myself, it's the last line. "or plan as the offense of
3 conviction." That's referenced in one B one point
4 three.
5    THE COURT: It comments, "was part of the same
6 course of conduct or common scheme or plan." Yes, "the
7 same course of conduct, common scheme or plan as the
8 case of conviction." And I think there is case law on
9 this, isn't there? Where you have to have an identical
10 modus operandi? Same objective? Things like that, to
11 determine whether it's the same course of conduct and so
12 forth?
13    MR. BUTLER: Your Honor, I did do some
14 research on this. I don't know if the Eleventh Circuit
15 has spoken directly to that, but the one case that I
16 pulled up was a situation in which an individual is
17 engaged in multiple fraudulent activities. One second,
18 let me get the case.
19    THE COURT: What about the Fuentes case?
20 United States vs. Fuentes at one oh seven F. third
21 fifteen fifteen where, what, the defendant was supposed
22 to have chopped eighteen Porsches for a period of three
23 years, and the Court found that while he was only
24 charged with a specific incident, that the modus
25 operandi were identical and the objective was similar;

Page 23

1 therefore, it was relevant conduct? Why isn't that same
2 principle applicable here?
3    MR. BUTLER: Your Honor, I don't have that
4 case before me. The case that I was going to reference
5 is United States vs. Block. It's not as directly on
6 point, or --
7    THE COURT: Do you have any cases that you
8 would like the Court to read that supports your view of
9 subparagraph two of one B one point three?
10    MR. BUTLER: No, Your Honor. I believe it's
11 our opinion that section one B one point two, the
12 language is clear, that additional interpretation is not
13 necessary. That being the language as the offense of
14 conviction references just that, the offense of
15 conviction for which an individual has entered a plea.
16    It is our position, Your Honor, that under the
17 Government's logic, even if stretching the logic of that
18 case, had Miss Taylor been involved in conduct similar
19 to this back while she was in high school and/or --
20    THE COURT: Well a time factor can be
21 important. I do consider temporality as a factor, too,
22 and we're here talking about a four year period in.
23    THE PROBATION OFFICER: It would be longer
24 than that, Your Honor. From nineteen ninety-three to
25 approximately two thousand two. As my review of it

Page 24

1 reflects, there was a two year time frame which she did
2 not do this; however, she was apparently in custody in
3 her hometown of Tulsa. So that would have explained
4 that interruption there.
5    THE COURT: Okay. What do you contend is the
6 similar modus operandi?
7    THE PROBATION OFFICER: From nineteen
8 ninety-three on through to two thousand two the method
9 of operation was to apply for various student loans in
10 either derivatives of her name or Social Security
11 number.
12    What I would like to just point to as
13 clarifying guideline interpretation is the commentary
14 application note number three on page twenty-eight under
15 "relevant conduct".
16    THE COURT: Is that note nine?
17    THE PROBATION OFFICER: Application note
18 three.
19    THE COURT: Oh, three. Okay. But I did look
20 at note nine too, which is on page thirty. About you
21 but go ahead.
22    THE PROBATION OFFICER: There are examples at
23 the bottom of page twenty-nine which talk about modus
24 operandi, temporal proximity, ongoing nature of --
25    THE COURT: That's application note what, now?

Page 25

1    THE PROBATION OFFICER: Three oh one B one
2 point three. It's on page twenty-eight of the guideline
3 manual.
4    THE COURT: Twenty-eight? Oh, I see, yes.
5    THE PROBATION OFFICER: And I think it's
6 pretty clear what the Commission intends to be done in
7 these type of situations.
8    MR. BUTLER: I'm not certain that that's
9 clear. I would like to know what Probation's position
10 is as to what the Commission's position is.
11    THE COURT: Probation? I think he's asking
12 you a question.
13    THE PROBATION OFFICER: I was letting you read
14 it, sir.
15    THE COURT: Okay, go ahead.
16    THE PROBATION OFFICER: However, I believe the
17 Commission is specifically saying that even though the
18 Government may not have charged the additional offense
19 or the additional offenses, that they are still to be
20 included as it specifically says --
21    THE COURT: Where they would be grouped.
22    THE PROBATION OFFICER: Right. "is to be used
23 to determine the total offense level, even if the
24 defendant is convicted of one single count charging only
25 one of the --" in this particular case it's talking

Page 26

1　about drug sales. But drug sales would also follow
2　under three D one point two B as well.
3　　　　MR. BUTLER: Just a brief response, Your
4　Honor. And the problem with this logic here is this
5　opens up individuals who have engaged in a pattern of
6　criminal activity to having an anvil dropped on them at
7　the time of sentencing. If the Government --
8　　　　THE COURT: The anvil is limited by the
9　limitation on what the Court can sentence them to. The
10　statutory limitation.
11　　　　MR. BUTLER: That is correct. But my point
12　being, if at the time of entry of plea or based upon a
13　review of discovery and/or investigation, the individual
14　believes that, for instance as in this case the victim
15　is Regions Bank, the amount of loss is nine thousand
16　dollars, if at the time of sentencing however Probation
17　determines that conduct has been ongoing over a period
18　of years, individuals are subject to unexpected
19　sentencing ramifications.
20　　　　It is my position, pursuant to Blakely, Booker
21　and the Supreme Court's minority dissent in Booker, that
22　this is one of the concerns when relevant conduct is
23　brought in.
24　　　　THE COURT: Well the only thing is while we're
25　doing all this calculation, it's not binding on the

Page 27

1　Court. That I will ultimately decide the sentence, but
2　I am not bound.
3　　　　MR. BUTLER: That is correct.
4　　　　THE COURT: But the Court finds that the
5　conduct alleged in the paragraphs at issue in the
6　Presentence Report are relevant conduct -- or is
7　relevant conduct, I guess I should say. There is
8　sufficient similarity, regularity and temporal
9　proximity.
10　　　　It's clear she was out to defraud. It's clear
11　that she used the same scheme to defraud, and the period
12　of nineteen ninety-three to two thousand and two is of
13　sufficient temporal proximity to warrant all of this
14　conduct being considered as relevant conduct. So the
15　objection is overruled.
16　　　　What's next?
17　　　　Now the only things that I have concerns about
18　is the restitution. I'll get back to that. I want to
19　take a Moment and research that. I'll be very candid
20　with you, I am very concerned that she's paying nine
21　thousand dollars. I think she owes forty something
22　thousand dollars, and if there is a way I can make her
23　pay forty thousand, I'm going to make her pay it. But
24　I'm not sure -- If the law says I can't do it, then I
25　can't do it. But I would like to research it.

Page 28

1　　　　MR. BUTLER: Your Honor, additionally, even
2　assuming the law, and it is our position that the law
3　does not stand for that position --
4　　　　THE COURT: I said I don't know whether it
5　stands for the proposition or not.
6　　　　MR. BUTLER: Assuming that it does stand for
7　the proposition that in a circumstance like this, the
8　Court could determine that the amount of loss
9　attributable for restitution to the defendant is that
10　much, in the event an individual is not able to pay that
11　amount, I think the restitution ordered has to be
12　tempered by that fact. But we'll address that later.
13　　　　THE COURT: Okay. Well first let me research
14　that. I know a sentence would be appropriate here as
15　the guidelines indicate, as well as what is it, three
16　five five six, is that right? The three five five six
17　factors; however, I am concerned that -- Pardon me,
18　three five five three factors; however, I am concerned
19　that she is not paying all the money that she should be
20　paying. But I may not be able to do that. If I can't,
21　I can't.
22　　　　MR. BUTLER: Yes, Your Honor.
23　　　　The next issue -- Did Your Honor want to take
24　a recess?
25　　　　THE COURT: No. We'll resolve this and then

Page 29

1　I'll take a brief recess just to confirm the cases that
2　Probation gave us. I'd like to read those for just a
3　minute.
4　　　　Mr. Speirs, did you cite a case as well?
5　　　　MR. SPEIRS: Your Honor, I don't believe I
6　cited a case. We just wanted to make sure the Court
7　understands that the Government did not limit the amount
8　of restitution at all. It says "no less than".
9　　　　THE COURT: Right. But I just want to make
10　sure that I'm on -- that I can't do it. If I can't do
11　it, I can't do it. I'm not going to do something that's
12　illegal.
13　　　　But go ahead. Any other objections that we
14　have now?
15　　　　MR. BUTLER: Yes, Your Honor. It was our
16　position that the criminal history of Miss Taylor is
17　overrepresented, given her personal characteristics and
18　background.
19　　　　THE COURT: She was convicted when?
20　　　　MR. BUTLER: She has multiple prior
21　convictions.
22　　　　THE COURT: Right, she has a lot of them.
23　Even if I were to say that her criminal history
24　overrepresents, and were to take away some of her
25　points, I'd have to take away a lot of points before it

Page 30

1 would affect her, wouldn't I?
2        MR. BUTLER: It would, Your Honor. And I make
3 this argument, and this is my next point, coupled with
4 arguments I'm going to ask make regarding asking the
5 Court to vary from the guidelines sentence and
6 determining what the appropriate sentence is, because
7 you are correct, based on my review Your Honor would
8 have to take away almost ten points.
9        THE COURT: More than that, wouldn't I?
10       MR. BUTLER: I'm just saying over ten points
11 to get to a level where you --
12       THE COURT: She has thirty-two criminal
13 history points, which gives her -- that puts her in a
14 category six.
15       MR. BUTLER: Solidly. Firmly a category six.
16       THE COURT: Pardon me?
17       MR. BUTLER: Solidly in a category six.
18       THE COURT: So how many points would I have to
19 come down?
20       MR. BUTLER: Twenty-four.
21       THE COURT: Yeah, that's a heck of a lot of
22 points to get her out of category six.
23       Anything else on the overrepresentation
24 argument?
25       MR. BUTLER: No, Your Honor.

Page 31

1        MR. SPEIRS: Your Honor, the Government would
2 just cite some cases that talk about overrepresentation
3 really is a pattern of conduct. And that's what the
4 focus is, the likelihood of recidivism. And in this
5 case, as the Court has already noted, Miss Taylor has
6 quite a history.
7        THE COURT: Yeah. I don't think there is any
8 overrepresentation here.
9        What's your next objection?
10       MR. BUTLER: Your Honor, my final objection is
11 what I'll call a -- I don't want to call it a Booker
12 objection, but it's a variance request. It is our
13 position that --
14       THE COURT: Now a variance is a different
15 matter.
16       MR. BUTLER: That is correct.
17       THE COURT: Okay. I want to talk about the
18 guidelines now, and then we'll talk about variance.
19       Have I ruled on all of the objections now?
20       MR. BUTLER: As to the guidelines.
21       THE COURT: Now you also ask for a downward
22 departure because of delayed federal prosecution? Are
23 you no longer pursuing that?
24       MR. BUTLER: Your Honor, and I believe that's
25 how it's being characterized by Probation. What I'm

Page 32

1 stating, Your Honor, is that under five G one point
2 three -- well, no, I will character it as that, Your
3 Honor. The reason being is this. Ms. Taylor has had, I
4 don't want to say misfortune, but as a result of facts
5 and circumstances, Miss Taylor is now before Your Honor
6 requesting sentencing. She has been in state custody
7 for approximately thirty months, Your Honor.
8        It has had -- I'm not sure how notice is
9 provided to the Government and how they initiate
10 prosecutions, but had this prosecution been initiated
11 thirty months ago, it's our position that Your Honor
12 would have had the authority, the discretion, not
13 required to impose a sentence in this case to run
14 concurrently with her state sentence.
15       THE COURT: I still can take that into
16 consideration, can't it?
17       MR. BUTLER: Yes. This can be -- I'm making
18 this argument for two reasons, Your Honor. One, under
19 five K two point zero, I guess it would be, that this is
20 the kind of an argument outside of the heartland for a
21 departure for those reasons.
22       Number two, it can be taken into consideration
23 later after the Court computes its guidelines for
24 purposes of whether or not to impose a sentence that
25 varies.

Page 33

1        Anyway, it is our position, though, that a
2 departure in this case would be warranted under the
3 guidelines before we get into variance, because had she
4 been sentenced thirty months ago, the Court would have
5 had the discretion to impose this sentence -- or to
6 allow this sentence to run concurrently with the state
7 sentence she has been writted out on.
8        Because of where she stands now, the Court, if
9 it elects to, will impose a sentence in this case.
10 Let's say it follows Probation's recommendation of
11 thirty months, that will then follow the thirty months
12 that she is now serving in the state when the Court
13 could have had the discretion of imposing them together.
14       THE COURT: Anything else from the Government?
15       MR. SPEIRS: Your Honor, just as to the term
16 of delayed federal prosecution, the Government just
17 wants to be on record that there is no delayed federal
18 prosecution. This case was brought to us by the
19 Department of Education, Office of Inspector General.
20 As soon as we got the case we prosecuted it with all due
21 dispatch, Your Honor.
22       THE COURT: I think his concern, though, is
23 she's been indicted for conduct that occurred what, in
24 two thousand and two? And the indictment didn't come
25 down until two thousand and six.

Page 34

1    MR. SPEIRS: Yes, sir, Your Honor, although,
2 you know, the Department of Education was investigating.
3 I'm not even sure when they even first recognized that
4 Miss Taylor might even be a potential defendant.
5    MR. BUTLER: All I can say is based on the
6 information I received from Probation as well as the
7 Government, no further investigation, at least as to the
8 criminal conduct which Probation and the Government now
9 believes the amount of loss should now be increased has
10 been further conducted, other than this information
11 that's been provided to the Government. No further
12 criminal investigation was done.
13    My point is one, I am not asserting that the
14 Government intentionally delayed. I know Mr. Speirs. I
15 do not believe that there was any delay on his part.
16 And my reference to Probation it was not delay in
17 prosecution, it was simply the fact that as a result of,
18 I think I used the word "procedural posture of this
19 case" she is now facing the possibility of essentially
20 being doubly dipped. Not doubly dipped, but receiving a
21 sentence which is overly punitive.
22    THE COURT: I'm not so sure her state
23 convictions overlap these convictions.
24    MR. BUTLER: No. When you say "overlap," the
25 conduct was overlapping?

Page 35

1    THE COURT: Yes.
2    MR. BUTLER: No. It is not our position that
3 the conduct was overlapping, simply that the Court would
4 have had the discretion.
5    THE COURT: Would have had the discretion.
6    MR. BUTLER: Right.
7    THE COURT: Well I've considered your
8 argument, and while the Court does have the authority to
9 depart downward based on delayed federal prosecution,
10 the Court declines to do so in this case.
11    The second issue is your request for a
12 downward departure because of her unique family and
13 personal circumstances, I'm not sure you're arguing
14 diminished capacity or what.
15    MR. BUTLER: Your Honor, to the extent
16 that that's -- I'm going to ask that that argument be
17 considered in my variance argument. I'll withdraw that
18 one.
19    THE COURT: Okay. Then that motion for
20 downward departure is denied as withdrawn, the one
21 regarding unique family and personal circumstances.
22    I think I've ruled on all the issues under the
23 guidelines, except the one that I said I wanted to look
24 at, which is on restitution.
25    MR. BUTLER: The guideline issues, Your Honor,

Page 36

1 there is nothing further -- there is one further factual
2 objection.
3    THE COURT: Okay. What's the factual
4 objection?
5    MR. BUTLER: On page --
6    THE COURT: Oh, that she broke her son's nose?
7    MR. BUTLER: Yes.
8    THE COURT: What is this about, her having
9 allegedly broken her son's nose?
10    THE PROBATION OFFICER: The case action
11 summary attached to Montgomery County Circuit Court case
12 number C C one zero one seven zero four for assault
13 second degree notes that the defendant punched her
14 eleven year old son, Lawrence Taylor, in the mouth with
15 a closed fist and hit him with a shoe, lacerating --
16 these are the court action summary notes, quote,
17 "lacerating his lips and breaking his nose."
18    Miss Taylor states that his nose was not
19 broken as a result -- I mean his nose did not bleed as a
20 result of her actions, but that he suffered a nosebleed
21 I think to overexcitation or hyperventilation. That she
22 did not cause his nose to bleed.
23    THE COURT: What does it say -- Could I see
24 the state court --
25    THE PROBATION OFFICER: I'm reading from the

Page 37

1 Presentence Report, but I will pull the case action
2 summary.
3    THE COURT: What page in the Presentence
4 Report are you reading from?
5    THE PROBATION OFFICER: Paragraph thirty-two
6 on page eleven.
7    MR. BUTLER: Your Honor, just so the Court is
8 aware, I have yet to see this case action summary. I'd
9 ask that I be allowed to view that as well.
10    THE COURT: Now you were reading from a state
11 report, though?
12    THE PROBATION OFFICER: I am pulling it now,
13 sir. Let me pull it.
14    THE COURT: Does it say she broke his nose in
15 the state report?
16    THE PROBATION OFFICER: Yes, sir. Let me see
17 really quickly what I have.
18    You can review the case action summary from
19 another document from the state probation office.
20    MR. BUTLER: Is that, this document, where it
21 came from?
22    (Whereupon, Mr. Butler conferred with
23 Probation Officer Caple off the record.)
24    THE PROBATION OFFICER: As you see, I have a
25 lot of material that I have to go through.

Page 38

1    THE COURT: Yes. While you're looking for
2 that, why don't I go ahead and look at this issue of
3 restitution.
4    THE PROBATION OFFICER: Yes, sir.
5    THE COURT: Do you have the citation for that
6 case? Do you have it?
7    THE COURT'S LAW CLERK: Yes.
8    THE COURT: Okay. We'll take a recess while I
9 take a look at that.
10    (Whereupon, a recess was taken.)
11    THE COURT: Counsel, I understand there may
12 have been some resolution in part for some of these
13 matters?
14    MR. BUTLER: Yes, Your Honor. This morning,
15 as a result of the Defense's objection to the amount of
16 loss calculation, as well as the Court's observations
17 regarding restitution, there was substantial discussion.
18 The parties have agreed that as to the amount of loss,
19 we are withdrawing our objection to Probation's
20 calculation of amount of loss.
21    We are stipulating that if this matter
22 proceeded forward, the Government would be able to put
23 on facts to establish an amount of loss at least in the
24 amount of --
25    MR. SPEIRS: Forty-seven thousand two hundred

Page 39

1 and forty-two dollars.
2    MR. BUTLER: Additionally, Your Honor, we're
3 agreeing that the amount of restitution that should be
4 attributable to Miss Taylor for purposes of this case
5 will be nine thousand forty-two dollars and thirty-four
6 cents.
7    THE COURT: Okay.
8    MR. BUTLER: There is one final issue, Your
9 Honor, and that is as to a factual representation
10 contained in the Presentence Report. If I can approach
11 the probation officer briefly? I haven't discussed that
12 with her.
13    THE COURT: Yes, go ahead.
14    (Whereupon, Mr. Butler conferred with the
15 probation officer, Ms. Caple, off the record.)
16    MR. BUTLER: Your Honor, the parties would
17 also agree that as to paragraph twenty-nine of the P. S.
18 I., that it should read on March eleven, two thousand
19 one the defendant and her son, Lawrence Taylor, were
20 involved in an altercation in which she struck her son
21 with her shoe. As a result of excitement, her son's
22 nose began to bleed. That being that the son's nose was
23 not -- did not bleed as a result of a shoe strike.
24    THE PROBATION OFFICER: That's paragraph
25 thirty-two.

Page 40

1    MR. BUTLER: I'm sorry, I wasn't sure what
2 paragraph.
3    THE COURT: The paragraph will be rephrased as
4 you stated.
5    MR. BUTLER: Thank you, Your Honor.
6    THE COURT: Anything else?
7    MR. BUTLER: And again, we'd ask that the P.
8 S. I. be amended to reflect that.
9    Nothing further as to guideline calculations
10 or factual allegation contained in the P. S. I.
11    THE COURT: Okay. And the Government agrees
12 to that, as well?
13    MR. SPEIRS: Yes, sir, Your Honor, that's
14 fine.
15    THE COURT: Is the defendant now ready for
16 proposed sentencing?
17    MR. BUTLER: No, Your Honor.
18    THE COURT: What else do we have?
19    MR. BUTLER: For purposes of sentencing --
20    THE COURT: That's right, you are going to
21 request for variance.
22    MR. BUTLER: Yes, Your Honor.
23    THE COURT: Go ahead.
24    MR. BUTLER: Your Honor, for that purpose we
25 have several witnesses which we would like to put on.

Page 41

1    THE COURT: Very good. Bring your witnesses
2 forward and we'll swear all of them in.
3    (Whereupon, all witnesses currently present
4 were duly sworn by the courtroom deputy clerk.)
5    MR. BUTLER: Lawrence Taylor.
6    L A W R E N C E    T A Y L O R,
7 the witness herein, having first been duly sworn or
8 affirmed to tell the truth, was examined and testified
9 as follows:
10    DIRECT EXAMINATION
11    BY MR. BUTLER OF LAWRENCE TAYLOR:
12 Q  Mr. Taylor, could you state your name and spell
13 your last name for the record.
14 A  My name is Lawrence Taylor. T-a-y-l-o-r.
15 Q  Mr. Taylor, do you know Bridget Taylor?
16 A  I'm her father.
17 Q  Mr. Taylor, where do you reside?
18 A  I reside in Lawrenceville, Georgia.
19 Q  And who do you reside there with?
20 A  My wife Willia.
21 Q  Your wife Willia, is she -- Her name is Willia
22 Taylor?
23 A  Yes.
24 Q  Is Ms. Willia Taylor Miss Bridget's Taylor's
25 biological mother?

Page 42

1  A  No, she's not.
2  Q  What is Miss Bridget Taylor's biological mother's
3  name?
4  A  Mahala, M-a-h-a-l-a.
5  Q  Do you know where Mahala is now?
6  A  No, sir, I don't.
7  Q  To your knowledge does anyone know her location or
8  whereabouts?
9  A  No, sir. I don't believe anybody does.
10  Q  Could you describe Mahala's relationship with
11  Bridget?
12  A  Yes.
13  Q  Starting -- Well, that was a little too broad.
14      Bridget lived with Mahala for approximately
15  how long, do you know?
16  A  I believe up until Bridget was about maybe ten
17  years old, I think. I'm just guessing. Seven years
18  old.
19  Q  Were there difficulties with Mahala's, possessive,
20  upbringing of Bridget?
21  A  Yes, sir.
22  Q  Could you describe when that began and the nature
23  of those.
24  A  Okay. Well, when Bridget was I'd say approximately
25  two years old, me and her mother was divorced. And from

Page 43

1  that time on, I guess because of -- and these are the
2  things I've heard from my other children -- was the fact
3  that Bridget resembled me so much --
4      THE COURT: Resembled whom?
5      THE WITNESS: Myself.
6      THE COURT: Okay.
7  A  That was one of the reasons that she had so much
8  animosity towards Bridget and treated Bridget the way
9  she did. I've had opportunities before I actually moved
10  away from Cleveland, Ohio to go by the home to visit my
11  children and come to find out that there was only one
12  child in the house alone at three years old.
13  Q  Let's back up.
14  A  Okay.
15  Q  You divorced Mahala when Bridget was approximately
16  two years old?
17  A  Yes.
18  Q  Do you have any other children with Mahala?
19  A  I have two other daughters.
20  Q  And what are their names?
21  A  Latonya and Valerie.
22  Q  Okay. Prior to divorcing Mahala, did you see or
23  observe any problems in her rearing at least Bridget, or
24  her raising of Bridget?
25  A  Well, she was basically mentally abused more so

Page 44

1  than physical, where I could actually see. I would
2  never ever see anything physical of course, but there
3  was always a mental abuse that I could detective.
4  Q  Jumping ahead a little bit, Mahala Taylor, your
5  ex-wife, Bridget's mother, do you know what her medical
6  status is right now, at least physical or mental health?
7  A  Well some years ago way back, I got information
8  because I was trying to get custody of the children and
9  there was a possibility that she was schizoid. I think
10  that's the right definition.
11  Q  Now don't tell --
12  A  I'm not sure of the medical term of it, but she was
13  having some mental problems, and because she was
14  constantly displaying this attitude and this -- the way
15  she was acting on all the children, Bridget also, but
16  Bridget was getting the worst because she was a baby.
17  Q  Okay. After you were divorced, you indicated that
18  you wanted to check on the status of your children, is
19  that correct?
20  A  Yes.
21  Q  I'm assuming primary custody remained with Mahala
22  at least initially?
23  A  I'm sorry?
24  Q  Primary custody of the children was with Mahala
25  initially?

Page 45

1  A  Yes.
2  Q  When you did visit the children, could you describe
3  -- were there any incidents when you visited that caused
4  you concern?
5  A  Yes.
6  Q  And could you describe those.
7  A  At least one?
8  Q  Yeah, describe that.
9  A  The one time that sticks out in my mind more than
10  anything else was that one day I went by to visit,
11  probably about eleven o'clock, twelve o'clock in the
12  day, and no one was home. At least that's what I
13  thought. And I went back later on about three or four
14  o'clock that afternoon, and I spotted Mahala and the
15  other two girls walking from the bus stop back towards
16  their home and I didn't see Bridget. And I was very
17  curious who was baby-sitting her.
18      And I kind of got excited and followed them
19  back into the house, and there Bridget was for all this
20  time strapped in a highchair with nothing but cracker
21  crumbs and nothing else in front of her on a highchair
22  table.
23  Q  About how old was Bridget at this time?
24  A  Maybe three.
25  Q  Okay. Was Bridget cared for that day? To your

Page 46

1 knowledge, had anyone been there baby-sitting Bridget?
2 A  No.
3 Q  And she was strapped to the highchair for, do you
4 know how long a period of time had she been strapped to
5 the highchair?
6 A  The time I can only tell you is when I checked and
7 when I came back, which is approximately five hours,
8 probably.  Four or five hours at that time.
9 Q  Okay.  Did you -- Did the children remain in
10 Mahala's custody?
11 A  Pardon me?
12 Q  Did the children remain with Mahala?
13 A  For approximately three more years.  Four more
14 years, Bridget did.
15 Q  Okay.  How about the other -- Let's clarify some
16 things.  How many children was Mahala caring for?
17 A  Caring for?
18 Q  Yes.
19 A  Three.
20 Q  Again, the oldest was --
21 A  They're four years apart.
22 Q  And the oldest was?
23 A  At the time --
24 Q  What was her name?
25 A  I'm sorry.  Latonya.

Page 47

1 Q  And the middle child?
2 A  Valerie.
3 Q  And Bridget was the baby?
4 A  Yes.
5 Q  After three years, Mahala was still caring for
6 Bridget?
7 A  Yes.
8 Q  The oldest child, what was the oldest child's name?
9 A  Latonya.
10 Q  Where was Latonya?
11 A  After Latonya became twelve, she moved in with me
12 and my wife.
13 Q  Were there any unusual facts or circumstances about
14 that transfer?
15 A  Basically abuse and she had a choice.  Her mother
16 actually asked her who she wanted to live with, and the
17 older child told me that she wanted to live with me.
18       THE COURT:  Live with whom?
19       THE WITNESS:  With me and my wife.
20       THE COURT:  Okay.
21 Q  And that being your current wife, Willia?
22 A  Yes.
23 Q  That left Valerie and Bridget to stay with Mahala?
24 A  Yes.
25 Q  At some point did Valerie and Bridget move in with

Page 48

1 or leave Mahala's custody?
2 A  Yes.
3 Q  Can you describe that?
4 A  Okay.  I got reports from my brother, who still
5 lives in Cleveland, was living in Cleveland, that he had
6 seen Bridget and she looked abused, basically, and
7 that's all I had to go on.  And at that time I had
8 contact with her mother and asked her could I come visit
9 and to see her and to spend some time with her.  And I
10 did, and of course this has been now twenty-five years
11 ago -- so I just took her.
12 Q  Did Mahala put up a fight and say I wanted them
13 back?
14 A  Yeah, after about two years.
15 Q  So it took her about two years to really say I want
16 my children back?
17 A  After two years she filed for child support, and at
18 that time I think I had all the children.
19 Q  When you took Bridget in, were you able to observe
20 or see any peculiar behavior?  Well let me rephrase
21 that.
22       Were you able to see any physical abuse?
23 A  Yes.
24 Q  Can you describe what you saw when you first took
25 in Bridget?

Page 49

1 A  The things that stuck out in my mind more than
2 anything else was that here was a six, seven, maybe
3 eight year old child that had physical burns on her
4 forehead and back into her scalp where her mother had
5 just let her sit with a hair treatment in her hair until
6 it burned her scalp.  That's just one thing.  I mean I
7 could probably go on.
8 Q  That's what you recall that jumped out at you?
9 A  That stuck out in my mind more than anything else.
10 It still sticks out in my mind.
11 Q  Did you, once you took her in, do anything to try
12 to address problems with -- psychiatric problems that
13 Bridget might have?
14 A  Yes, sir.  I exhausted my insurance in just numbers
15 of years.  Exhausted my insurance with her going to see
16 psychologists and psychiatrists as a child.
17 Q  So from the time that you took her in at the age of
18 six or seven, you began to send her to psychiatrists and
19 psychologists?
20 A  After she was probably about ten years old.  I
21 started to notice different things started missing.  She
22 was trying to, and this is just my opinion, she was
23 trying to earn favor of her mother.  She would take from
24 her stepmother unknowingly and send jewelry and money
25 and things that she would actually steal from her

Page 50

1  stepmother to her mother.
2  Q  I may have asked this poorly earlier, but do you
3  have any current knowledge of the psychiatric state of
4  your prior wife, Mahala?
5  A  I probably haven't seen or heard of her in at least
6  ten years.
7  Q  Though you haven't seen or heard from her, do you
8  have any knowledge of what her psychiatric condition is?
9  A  I've heard that she's a schizoid.
10 Q  That's what you know as schizoid?
11 A  As far as I know, yes.
12 Q  Thank you.  Nothing further.
13      THE COURT:  Cross?
14      CROSS EXAMINATION
15      BY MR. SPEIRS OF LAWRENCE TAYLOR:
16 Q  Good afternoon, sir.
17      My name is Verne Speirs.  I'm with the federal
18 government, the U. S. Attorney's Office.
19      Sir, you would agree with me, wouldn't you,
20 that in fact many people suffer from poor upbringing,
21 isn't that right?  There a lot of people that come up in
22 difficult circumstances.
23 A  Yes.
24 Q  And certainly many people come up in difficult
25 circumstances, but yet don't choose to break the law,

Page 51

1  isn't that right?
2  A  Mm-hmm.
3  Q  Okay.  And, sir, you would agree with me here that
4  your daughter knows the difference between right and
5  wrong, isn't that correct?
6  A  Yes.
7  Q  She knows that to steal is wrong.
8  A  Sure.
9  Q  She knows that lying is wrong.
10 A  Mm-hmm.
11 Q  She knows that forging documents is wrong.  So
12 there is no question about her understanding of the
13 wrongfulness of those acts, isn't that right?
14 A  As far as I know, yes.
15 Q  Now, sir, you talked about the abuse of your
16 daughter at a very early age.  If you would, when did
17 you call the police in order to report that your child
18 was being abused?
19 A  Probably when she was three or four years old.  I
20 actually tried to get custody of her through that fact.
21 Q  That wasn't my question, sir.  I'm talking about
22 calling the authorities, calling the police or calling
23 Youth Services to have a child taken out of an abuse
24 situation.
25 A  When did I do that?

Page 52

1  Q  Yes, sir.
2  A  Like I said, when she was about two or three years
3  old.
4  Q  And what happened?
5  A  Nothing.
6  Q  Nothing happened?
7  A  Nothing happened.
8  Q  You'll agree with me, sir, that your daughter knows
9  the difference between right and wrong?
10      THE COURT:  You've asked him that.
11      MR. SPEIRS:  Thank you.  No further questions.
12      MR. BUTLER:  No further questions.
13      THE COURT:  You may step down.
14      (Whereupon the witness, Lawrence Taylor,
15 stepped down from the stand.)
16      MR. BUTLER:  I'd call Willia Taylor.
17      W I L L I A   T A Y L O R,
18 the witness herein, having first been duly sworn or
19 affirmed to tell the truth, was examined and testified
20 as follows:
21      DIRECT EXAMINATION
22      BY MR. BUTLER OF WILLIA TAYLOR:
23      THE COURT:  Proceed.
24      MR. BUTLER:  Your Honor, Probation just
25 provided a document to the Government that I'd like to

Page 53

1  see.
2      (Whereupon, Mr. Butler examined said
3  document.)
4  Q  Could you state your name and spell your last name
5  for the record.
6  A  Willia Taylor, T-a-y-l-o-r.
7  Q  Could you bend that microphone?  Just go ahead and
8  bend it down.  There you go.
9      Miss Taylor, do you know Bridget Taylor?
10 A  Yes.
11 Q  And how do you know Miss Taylor?
12 A  She's been my daughter for twenty-nine years now.
13 Q  I see that you used the term your daughter.  Are
14 you her biological mother?
15 A  No.  I didn't give birth to her, but I'm her
16 mother.
17 Q  But you consider yourself her mother?
18 A  Absolutely.
19 Q  You have been present in court?
20 A  Excuse me?
21 Q  You have been present in court all morning,
22 correct?
23 A  Yes.
24 Q  And you heard Morris Taylor's testimony regarding
25 Willa?  That's her biological mother?

Page 54

1 A Yes.
2 Q Have you ever met Willa Taylor?
3 A I am Willia Taylor. I think you mean Mahala.
4 Q I'm sorry, I'm getting them confused. Yes, Mahala
5 Taylor?
6 A Yeah.
7 Q And do you know what her current psychiatric
8 condition is?
9 A Have I been told by a medical doctor or seen
10 documentations? No. However, I was told that she's
11 schizo or schizophrenic, if I'm pronouncing it correct.
12 That came from her mother; that her Mom knew that she
13 had been locked up in the a mental institution several
14 times and that's what she was diagnosed as.
15 Q So you were informed by Mahala's mother that Mahala
16 had been diagnosed as schizophrenic and had been in a
17 mental hospital several times?
18 A Yes.
19 Q Do you know where she is now?
20 A I have no idea. I know that after the three
21 children that my husband has -- there is three other
22 children, one is here in the courtroom today, and there
23 is two others -- that one I've never met. And I've got
24 to know those children through Bridget, because Bridget
25 would go and find them and bring them with her. And

Page 55

1 she'd do the same thing with her mother.
2 Q Let me back up. I was a little unclear. Bridget
3 would go and find who?
4 A The other three siblings that Mahala gave birth to
5 after she and my husband divorced. Not Bridget that
6 Mahala gave birth to. I'm sorry.
7 Q That's all right. When did Bridget move in with
8 you?
9 A Bridget was seven years old, and my husband I think
10 said ten, but initially when Tonya, the oldest daughter,
11 requested to come and live with us or Lawrence's parents
12 said, "You need to take the children." And Tonya told
13 her Mom she wanted to come, and Mahala was so upset --
14 Tonya's wrist had been broken, and she said
15 her mother did it. And I guess to keep the authorities
16 from acting on that, Mahala allowed Tonya to come and
17 live with us. From that we learned about other abuse
18 that my husband didn't know about from the other two
19 girls.
20 Q Okay. From that you learned -- Who informed you
21 that other abuse was taken back?
22 A Tonya did initially, and Lawrence's parents lived
23 in Ohio and they would go over and get the kids and keep
24 them for weeks at a time and Mahala was okay with that.
25 And then she would go on a rampage and want them back.

Page 56

1 His parents was the one that was continuing telling us,
2 "You need to take these children. Something bad is
3 going to happen if you don't."
4 And Bridget was the worst of them all. When
5 she came to us at seven, Mahala insisted on getting the
6 kids back, and Bridget went back with her Mom. She
7 insisted. She cried she wanted to go back, and even
8 when she came with us at seven, the hair was burned out.
9 It was just abuse. I mean she was so clingy to me, and
10 I had two children by my first marriage, and she was
11 just dying for attention and love, and it was really
12 hard for me.
13 Q Okay. Let's go through this bit by bit. When
14 Bridget moved in with you at age seven, is it your
15 testimony that when she first moved she actually wanted
16 to return to live with Mahala?
17 A Yes.
18 Q Okay. Was she taken back, or did she return to
19 Mahala's care?
20 A Because my husband didn't have legal custody of
21 them Mahala insisted, and I'm not sure of all of the
22 ramifications of it then, but Bridget was able to go
23 back with her mother and she was there for almost a
24 year.
25 Q When she returned -- I'm assuming she then returned

Page 57

1 back to you?
2 A Yes, she did.
3 Q Is that when you indicated that her attitude toward
4 you and the family had changed and she was very clingy?
5 A She was clingy the whole time, but it had gotten
6 worse. I mean, she wanted all of my attention. I have
7 a daughter that's here today who is Bridget's sister,
8 but not biologically. It was always a tussle, because
9 they were like the same age. Bridget is like five
10 months older than her. And anything that was going on,
11 Bridget wanted to push her out of the way because she
12 needed that attention.
13 Q Did you consider this to be normal sibling rivalry?
14 A No. And the other children didn't consider it as
15 being that. Tonya, being the oldest --
16 Q Let's not talk about the other children.
17 A All right.
18 Q What did you consider it?
19 A Well I didn't know at first. I mean I wasn't -- I
20 was a brand new stepMom, and all I knew is what I was
21 hearing from the other children and from Bridget about
22 their Mom and I was trying to do the best I could. I
23 mean at first I kind of catered to it, and then it got
24 to the point that it was very hard for me to just ignore
25 my own children and just give all the attention to her.

Page 58

1 And nobody taught me how to be a stepMom, so I was
2 trying to do the best that I could.
3 Q  And these questions aren't intended as any type of
4 judgment on you, I'm just trying to get your
5 observations as to Bridget's behavior when you first
6 started to be her stepMom. It's your testimony that she
7 was very clingy?
8 A  Clingy. She would do anything that I asked her to
9 do. If there was chores for the other kids to do, she
10 would jump and do it first. Especially my daughter,
11 Monica, she would jump and do it first. She wanted to
12 please me at any cost. And that was -- I didn't realize
13 all of that until years later, that that's what it was
14 until after we started taking Bridget to see a child
15 psychologist.
16 Q  That was my next series of questions. Did you and
17 your husband find a need to take her to a child
18 psychologist?
19 A  Absolutely. It was the competitiveness with the
20 one daughter that I had, her not telling the truth. For
21 instance, I'd be headed to work in the mornings and go
22 into my work, stop and get gas, and these are a couple
23 of incidents that I can remember. I'd go into my wallet
24 to get gas and my money was gone. After a while we knew
25 that Bridget was taking it, and after a while she'd own

Page 59

1 up to it and we was told by Lawrence's parents that the
2 money -- that the Bridget was sending me Mahala money,
3 and Mahala would tell me thanks for letting Bridget
4 sending me money.
5     And I'm like, "Okay, when did she send you
6 money?" And jewelry. She would take my jewelry and
7 send it to her Mom. Her goal was to please her Mom. So
8 that's when I started to understand that this is the
9 thing of trying to please me. That's when we started
10 taking her. I'm thinking Bridget was probably eight
11 and-a-half, nine years old. We had her almost a full
12 two years when we started taking her to a psychologist.
13 And we did that for about four years.
14     They would only let us use so much insurance
15 money a year, so we would take her until the insurance
16 money ran out and then that time would be cut off until
17 my husband's insurance would roll over again. Because
18 financially we couldn't afford it, but then we'd start
19 taking her again.
20 Q  The stealing she was doing, she was stealing from
21 you and your husband, her biological father, and sending
22 the proceeds to her mother back in Cleveland?
23 A  Mm-hmm, yes.
24 Q  She wasn't using the money for herself, she was
25 sending it back to her mother in Cleveland?

Page 60

1 A  Yeah. I don't know in I can jump the gun and say
2 this or not, but even during her adult years when
3 Bridget started doing all of these things that she's
4 been accused of, we knew she would eventually say I did
5 it, but it was hard for us to believe because we never
6 saw evidence of it. She would not embezzle money or use
7 somebody's credit card to buy fancy cars or fancy
8 clothes; it was always to buy stuff for her children.
9 Just overwhelm them with gifts.
10     And the family, we started to get gifts in the
11 mail that she was sending us, and we asked, "Where are
12 you getting the money from?" And all of a sudden the
13 next thing we know, she's arrested. And we do what
14 we're doing now, and she'd say, "Mom, I'll get better."
15 Q  Did her actions seem like some type of misplaced
16 attempt to garner favor?
17 A  That was it. And her sister said the same thing.
18 We all knew that. And I guess the judges knew that
19 because several times she was ordered to have mental
20 therapy, and we would think it would be working and I
21 guess when the therapy was over and she wasn't going to
22 counseling any more, and I don't know what would trigger
23 it, but once again, Bridget would be in trouble again.
24     After a while my husband and I started
25 thinking okay, where did we go wrong? What did we do?

Page 61

1 Should we have done something different? I don't
2 know.
3 Q  I understand.
4     To this day, do you know whether or not --
5 Well, let's put it this way: Prior to Ms. Taylor's
6 current incarceration, do you know whether she was still
7 making attempts to stay in touch with her mother and/or
8 whether she was in touch with her mother.
9 A  Just a few years before -- I guess I'm safe to say
10 three or four years ago Bridget actually went to Ohio
11 and picked her Mom up and brought her mother back here
12 to Montgomery to live with her. And that lasted almost
13 a year. But it never stopped. It was when Bridget was
14 in Oklahoma her mother gave birth to one of the last
15 children at Bridget's house. I mean it was like, okay,
16 I can't do enough for my Mom, and it just drove us crazy
17 because --
18 Q  Did it strike you, given her past history of
19 abusing Bridget, how did Bridget's desire to --
20 A  It was like non-existent. It was like my Mom was
21 the most wonderful person in the world, and whatever she
22 could do for her mother, she did it. It was an ongoing
23 thing. And I think maybe -- Even the last time that
24 Mahala was at Bridget's house she would just go
25 ballistic to Bridget and say mean things and do things

Page 62

1  to her and talk bad about her to the neighbors and this
2  is what her daughters, Bridget's daughters, would tell
3  me.
4  Q  So Bridget is reaching out, driving to Ohio to get
5  her mother, drive her down here to live with her and her
6  mother is berating her and being difficult?
7  A  Absolutely. And I think when Mahala left her
8  house, if I'm not mistaken, she left without even
9  telling Bridget she was leaving. Just out of the blue
10 Bridget came home from work one day and she was gone.
11 And that devastated her.
12 Q  There's never been a debate that Bridget knows
13 right from wrong. She does know right from wrong.
14 A  I'm not a psychiatrist, and I think to a certain
15 extent yeah, she knows right from wrong. I think
16 sometimes I'm not sure what's going on in her head when
17 she does the things that she does.
18       The only thing I can tell you that always
19 struck us odd is that when we would find out that
20 Bridget was in trouble again, and I'm saying in trouble,
21 when she had been arrested and she'd call us or whoever
22 would call us, we'd start doing a mental evaluation.
23 Okay, what did she do with the money? If she was using
24 credit cards, what was she buying? We could always
25 trace it back to a holiday. It was like at Christmas.

Page 63

1  Her children would always have the best of everything.
2  They would have the fanciest of electronic equipment.
3        She always had a broke down car. She never
4  dressed fancy. She never bought jewelry. It was always
5  -- and then we'd feel guilty because we got this gift
6  from Bridget, this is probably -- she used this, you
7  know, and she was always wanting to overwhelm the
8  family. It was like she wanted to buy favor, or love, I
9  guess.
10 Q  Nothing further.
11      THE COURT: I have a question for you.
12      THE WITNESS: Okay.
13      THE COURT: Was she ever required to pay the
14 money back?
15      THE WITNESS: I'm not sure, sir. I don't know
16 if there was restitution. I'm sure maybe there was, I
17 don't know. I honestly do not. Maybe I should know,
18 but I don't.
19      THE COURT: When you were raising her, was she
20 ever required to pay the money back?
21      THE WITNESS: The money back that she took
22 from us? No.
23      THE COURT: She's never been through a
24 scenario where she had to pay the money back?
25      THE WITNESS: Not in our home, no.

Page 64

1       THE COURT: That you're aware of.
2       THE WITNESS: That I'm aware of.
3       THE COURT: Either inside the home or outside
4  the home?
5       THE WITNESS: Outside the home, I can't say.
6       THE COURT: That's what I'm saying Are you
7  aware of any instance --
8       THE WITNESS: No, I'm not aware.
9       THE COURT: Okay. Go ahead.
10          CROSS EXAMINATION
11      BY MR. SPEIRS OF WILLIA TAYLOR:
12 Q  Very briefly, Ma'am. My name's Verne Speirs. I'm
13 with the U. S. Attorney's Office. None of my questions
14 are meant to put you on the spot, but just to get an
15 understanding.
16      Ma'am, you would agree with me that there are
17 many people that are raised in very difficult
18 circumstances. You would agree with that, correct?
19 A  Absolutely.
20 Q  And some people are raised in orphanages, some
21 people are raised by drug addicts, some people are
22 raised with no parents at all. Isn't that correct?
23 A  That's true.
24 Q  And, ma'am, it's not necessarily because you come
25 up from bad circumstances that you're going to choose,

Page 65

1  make a choice to break the law?
2  A  I can't tell you that. You're talking some people.
3  My daughter is not some people. She's one person. And
4  I don't know -- I don't think she chose it. I think
5  it's a mental thing for her, and I may be speaking out
6  of turn and I don't know if this is good or bad for her
7  right now, but I don't think she chose it.
8        I think subconsciously it was chosen, but did
9  she the person, Bridget, that we know from time to time,
10 did she choose it? No. And yeah, people are raised in
11 different diversities and they have obstacles to
12 overcome. Some people are stronger than others. Some
13 overcome it and some do not.
14      Look at Bridget's sisters, okay? The oldest
15 one, Tonya, she works for the justice system. She
16 overcame it. Bridget did not. So we can do the some
17 people, but she's not some people.
18 Q  Yes, ma'am. You raised an interesting point
19 because I believe Mr. Butler asked you whether she knows
20 the difference between right and wrong.
21 A  At times I think she does, and at times I'm totally
22 convinced she doesn't. I'm not a psychiatrist and
23 neither are you, so I don't know.
24 Q  Ma'am, I don't pretend to be. I'm just here to ask
25 some question.

Page 66

1  A  Okay.
2  Q  I'm not pretending to be a psychiatrist.
3  A  But you're asking me questions that there is no yes
4  or no answer to.
5  Q  Well, Ma'am, you would agree with me, though, that
6  people are raised in all different types of situations?
7  A  Well, I know how my children was raised and I know
8  of how Bridget was raised in her very first six, seven
9  years of life.
10 Q  Sure.  And, ma'am, just because you are raised in a
11 difficult situation doesn't mean that later in life you
12 choose to break the law?
13 A  I don't know that.
14 Q  Thank you, ma'am.
15     THE COURT:  Anything else for this witness?
16     MR. BUTLER:  No, Your Honor.
17     THE COURT:  You may step down.
18     (Whereupon the witness, Willia Taylor, stepped
19 down from the stand.)
20     MR. BUTLER:  Yes, Your Honor.  At this time I
21 call Valerie Hasty.
22         V A L E R I E     H A S T Y,
23 the witness herein, having first been duly sworn or
24 affirmed to tell the truth, was examined and testified
25 as follows:

Page 67

1         DIRECT EXAMINATION
2         BY MR. BUTLER OF VALERIE HASTY:
3  Q  Ma'am, could you state your full name and spell
4  your last name for the record.
5  A  Valerie Hasty, H-a-s-t-y.
6  Q  And do you know Bridget Taylor?
7  A  She's my little sister.
8  Q  Okay.  You have been in court this morning?
9  A  Yes.
10 Q  And you've heard the testimony of her father and
11 her stepmother, correct?
12 A  Yes.
13 Q  You lived -- Your mother is Mahala Taylor?
14 A  Yes.
15 Q  You have an older sister.  What's her name?
16 A  Latonya.
17 Q  And your baby sister would be?
18 A  Bridget.
19 Q  Bridget.
20 A  And I have three brothers.
21 Q  And you have three brothers as well.
22 A  Four.
23 Q  Are they younger or older?
24 A  Younger.
25 Q  Than you and Bridget?

Page 68

1  A  Yes.
2  Q  I'm going to focus on the time that you, your older
3  sister and Bridget were with your mother.  Okay?
4  A  Okay.
5  Q  Do you recall your mother being difficult -- Let me
6  rephrase that.
7         Could you describe your mother's approach to
8  rearing Bridget?
9  A  Yes.  I can start out by saying that when Bridget
10 was born, my Mom was always very critical of her because
11 she looked like my father.  She also used to say that
12 Bridget should have been a boy.  Anything that Bridget
13 did she pretty much criticized her, criticized the way
14 she'd eat, criticized the way she'd talk, the way she
15 sits.  She wasn't pretty.  Her hair was bad.  She had
16 bad hair.  Everything was --
17 Q  Did you and/or your sister receive the same form of
18 criticism that you could observe?
19 A  No.
20 Q  Your mother had episodes where she was difficult
21 towards you and your sister, I'm assuming?
22 A  Yes.
23 Q  But was the level of, I'm going to use the word
24 "abuse" and you can correct me if I'm wrong, that you
25 and your sister subject to the same as what Bridget was

Page 69

1  subject to?
2  A  No, it wasn't.
3  Q  Was the level that Bridget was subjected to much
4  worse or worse?
5  A  Bridget was treated worse, yes.
6  Q  Okay.  Could you describe -- Did any incidents --
7  You mentioned her hair.  Could you describe any
8  incidents involving Bridget's hair and her mother?
9  A  Well, there were two incidents that I remember with
10 Bridget's hair.  When Bridget was in kindergarten my
11 Mom, you know, said that Bridget had bad hair.  Whenever
12 she'd comb Bridget's hair, Bridget would cry or run away
13 so she wouldn't get her hair combed.  And one day I was
14 in school in the lunch line, I saw my sister across the
15 cafeteria, she had no hair.  My Mom cut all her hair off
16 and sent her to school with no hair.  So she looked like
17 a little boy and she was mocked at school by other
18 children because she didn't have any hair.
19         And there was another incident that Bridget
20 was a little older at the time where --
21 Q  How old was she at this incident when her Mom
22 decided to cut off all of her hair?
23 A  Probably five or six, I guess.  However old.
24 Q  I think it's important that this be made clear.  It
25 wasn't just I'm going to cut it short like a little bob.

Page 70

1 A  No.
2 Q  When you say "cut all off," was it bald like mine?
3 A  She had a little more than you. It was just cut
4   off. No style, it was just cut like she took the
5   scissors and cut it off. But I wasn't there at the time
6   when she did it. I'm sure she was upset.
7 Q  You were then going to talk about another incident?
8 A  The other instance was, you know, that my father
9   spoke about when she put the relaxer in her hair and I
10  was outside --
11 Q  Could you describe for people who might not know
12  what relaxer is, could you describe what it is?
13 A  A relaxer is a creamed conditioner that you put in
14  your hair for African-Americans hair could be
15  straighter, instead of being so curly. And it gets hot
16  when you put it on your scalp after a certain amount of
17  time.
18 Q  As a result of a chemical reaction which creates
19  heat?
20 A  Right, exactly. And I was outside at the time when
21  my Mom was doing Bridget's hair, and I could hear her
22  screaming but Bridget used to scream when she got her
23  hair combed anyway. So I could hear her screaming,
24  "Stop. Stop." And so a little later I came in the
25  house and Bridget was sitting in the living room with a

Page 71

1   scarf on her head shivering with a towel around her
2   shoulders.
3 Q  When you say "a little later," how long is a little
4   while later?
5 A  I'm not sure exactly how much time passed because I
6   was outside playing. I was a kid so I don't know. It
7   was just maybe thirty, forty minutes or so. And so I
8   came in the house and Bridget is shivering, but she
9   wasn't crying. Just was shivering and, you know,
10  dripping wet and her head was burned. Her hair was just
11  like it was burnt down on her scalp and all of this area
12  was burned. All of the front.
13      My Mom was just acting like nothing really
14  happened, and Bridget was just shivering and shaking.
15  She wasn't crying, but she was in a lot of pain and for
16  months after that Bridget couldn't do anything to her
17  hair because it was all matted down and it was
18  horrible.
19 Q  Does your sister still have scars on her head to
20  areas where she had been burned by her mother?
21 A  Yes, she does. And she wears her hair in front of
22  her face so that nobody can see the burns on her scalp.
23  But yeah, it's still there.
24 Q  You were present in court where the Government
25  counsel was saying that people have it tough growing up

Page 72

1   sometimes.
2 A  Yes.
3 Q  Did Bridget have it pretty tough when her mother
4   was burning her with her hair?
5 A  Yes, she did.
6 Q  Something that can kind of scar someone when your
7   mother burns you?
8 A  I think so.
9 Q  Additionally, do you recall any other incidents
10  where her mother was physically abusive?
11 A  Yes, I can. Well, my Mom used to also criticize
12  the way Bridget eats, so Bridget didn't like to eat when
13  we ate dinner. She wouldn't eat. So she would try to
14  eat when everyone was in bed sleeping and my Mom would
15  catch her eating and would punish her for eating. So
16  Bridget just didn't eat.
17      She was underweight when she moved in with my
18  Dad. That was one thing.
19      She would not buy Bridget things, so a lot of
20  times when Mom would go shopping and there was an
21  instance where Mama went bought me a banana seat bike
22  and bought my sister some roller-skates and bought
23  Bridget nothing.
24 Q  Was that a regular routine happening?
25 A  Yes.

Page 73

1 Q  I mean, did your mother show affection, to the
2   extent she showed affection, did she show it toward you
3   and your other sister and ignore Bridget?
4 A  Yes. She would leave Bridget out of a lot of
5   things. We would go out to eat sometimes and Bridget
6   wouldn't go. It was ongoing. She mistreated Bridget
7   openly, and I begged my sister to go and stay with my
8   Dad because she didn't want to leave because she loved
9   my Mom so much.
10 Q  When you say you're sister, you're talking about
11  Bridget?
12 A  Bridget. Mm-hmm.
13 Q  So even given fact that she is being both
14  physically and emotionally abused, where did she want to
15  live?
16 A  She wanted to live with my Mom.
17 Q  Your biological mother?
18 A  Yes.
19 Q  Do you know where your mother is now, your
20  biological mother?
21 A  No, I do not know where she is.
22 Q  Are you aware of whether or not she has been -- any
23  psychiatric diagnosis has been given regarding your
24  mother?
25 A  My grandmother said that she was a schizophrenic,

Page 74

1 and that she was in a hospital at one time. But me
2 personally? I've never seen a doctor tell her that.
3 Q  When was the last time that you ever saw your
4 mother?
5 A  I saw my mother about six years ago.
6 Q  And how was she at that time?
7 A  She was not herself. She was very different.
8 Q  When you say "very different," what does that mean?
9 A  She makes up stories and thinks they're true. I
10 mean, she acted like -- I don't know, she makes up all
11 of these different stories like she says she met Michael
12 Jordan. She just makes up stories and she believes
13 them. She won't tell me where she's been, because I had
14 asked her where had she been. And I could tell she had
15 been homeless.
16 Q  How could you tell that?
17        MR. SPEIRS: Your Honor, we're going to
18 object. I think that we've established that Bridget's
19 mother may have a whole host of problems, but I think we
20 could go on for quite a long time --
21        THE COURT: I think that's correct. We don't
22 really need to go into a lot of detail about this.
23        MR. BUTLER: Nothing further.
24              CROSS EXAMINATION
25          BY MR. SPEIRS OF VALERIE HASTY:

Page 75

1 Q  Ma'am, My name's Verne Speirs. I'm a federal
2 prosecutor. None of my questions are to embarrass you
3 or put you on the spot. Please understand that, but,
4 ma'am, how familiar are you with your sister's criminal
5 history?
6 A  I'm familiar with it.
7 Q  Okay. So, ma'am, you would know that her criminal
8 history really begins back at the age of nineteen,
9 continuing up until today, is that right?
10 A  Yes.
11 Q  And, ma'am, throughout knowing your sister, do you
12 know whether she's ever been forced to apologize to the
13 people that she's stolen from, or make any type of
14 payment to people that she has stolen from in the past?
15 A  I recall her saying something about paying
16 restitution at one time.
17 Q  And, ma'am, you would agree with me that, and I've
18 asked this question before, a lot of people grow up in
19 difficult circumstances. You would agree with that?
20 A  Yes, people grow up in difficult circumstances.
21 Q  And, ma'am, not everybody who grows up in difficult
22 circumstances chooses to break the law.
23 A  I don't believe everyone chooses to break the law
24 that grows up in a difficult situation.
25 Q  That's all.

Page 76

1        MR. BUTLER: Nothing further.
2        THE COURT: Thank you.
3        (Whereupon the witness, Valerie Hasty, stepped
4 down from the stand.)
5        THE COURT: Next witness.
6        MR. BUTLER: Yes, Your Honor. At this time I
7 call Dr. Goseley.
8        MR. SPEIRS: Your Honor, we're going to
9 object. If I may, Your Honor?
10        THE COURT: Yes.
11        MR. SPEIRS: I received a fax from Mr. Butler
12 on the nineteenth regarding a forensic evaluation, and
13 in his letter he says he "won't be using any information
14 in the evaluation for purposes of a downward departure."
15 There is a report that is attached to this. There was
16 no C. V. There was no notice of any type of expert
17 witness being called for this particular hearing.
18        The Government was not put on notice pursuant
19 to Rule sixteen that there would be an expert at this
20 particular hearing. As a result of that, the Government
21 didn't have the opportunity to go out and find its own
22 expert witness.
23        Now the Government doesn't necessarily have a
24 problem with the Court looking at this particular
25 forensic evaluation, but in the interest of fairness if

Page 77

1 Mr. Butler was going to put on an expert for this
2 hearing, I think he was obliged to tell the Government
3 his intentions to do that and that the Government would
4 then have had the opportunity to get its own expert if
5 it so chose.
6        MR. BUTLER: By way of response a couple of
7 things. Number one, according to Rule sixteen, I don't
8 have to provide the Government with notice of experts
9 that I intend to put on at the time of sentencing. At
10 the time of trial I agree I do.
11        THE COURT: What does Rule sixteen say?
12        MR. BUTLER: I'm assuming that's Federal
13 Criminal Rule of evidence -- Rule of Criminal Procedure?
14        MR. SPEIRS: Yes.
15        MR. BUTLER: Expert witnesses, Your Honor --
16        THE COURT: Rule sixteen?
17        MR. BUTLER: Yes, Your Honor.
18        MR. BUTLER: Sixteen B -- Well, one second.
19 Sixteen C. "The defendant must, at the Government's
20 request, give the Government a written summary of any
21 testimony that defendant intends to use under seven oh
22 two, seven oh three, seven oh five of the Federal Rules
23 of Evidence as evidence at trial." And that's key, and
24 then it goes into some other conditions.
25        This is not a trial, this is sentencing. The

Page 78

1 Court can give this evidence the weight it deems
2 appropriate. I am not putting this witness on for
3 purposes of diminished capacity. If I was putting this
4 witness on for purposes of diminished capacity, as a
5 result of a recent amendment I believe to the Court
6 rules, I would have been required to notice both
7 Probation and the Government of that intent so to allow
8 them the opportunity to have their own psychiatric
9 evaluation done. Number one.
10     Number two, the Government is accurate in that
11 on the nineteenth I did fax them a report. On or about
12 the nineteenth or the twentieth I also did let the
13 Government know orally that I would be calling
14 Dr. Goseley at sentencing. I did not provide the C. V.
15 until today. But the Government has been on notice that
16 Dr. Goseley was going to testify at this hearing since
17 the nineteenth.
18     THE COURT: How were they on notice?
19     MR. BUTLER: I sent them the expert report,
20 Your Honor, and told them by way of phone that I was
21 calling them.
22     THE COURT: Oh, as an expert witness?
23     MR. BUTLER: Well, that I was calling him. I
24 don't know if I used the word expert witness.
25     MR. SPEIRS: And, Your Honor, if I might

Page 79

1 respond? I have the utmost respect and deference to Mr.
2 Butler. I do not recall any discussion that this
3 witness would be called.
4     MR. BUTLER: There is no requirement that I'm
5 aware of, Your Honor, other than the recent amendment to
6 the local rules, that notice of experts at sentencing
7 needs to be given. I can understand the reason that the
8 local rule was amended to allow them to respond to
9 arguments of diminished capacity, which is a legal one.
10 This testimony, Your Honor, I am offering for purposes
11 of clarification of Miss Taylor's mental state, as well
12 as for purposes of an argument underneath the guidelines
13 variance.
14     The Eleventh Circuit, much to our chagrin, has
15 informed the Defense, though this will not be a normal
16 part of the practice of our office, that notice is not
17 required for a variance to the parties.
18     THE COURT: Notice of what?
19     MR. BUTLER: The Court -- Let's say if the
20 Court was required to -- was going to vary from the
21 sentencing guidelines, notice would not be required to
22 be given to the parties of the Court's intent to do so.
23 It is my belief, unfortunately, though this was not the
24 intent in this case, using the same logic from the
25 Eleventh Circuit's reasoning, what we're doing right now

Page 80

1 is putting this expert on not for purposes of a
2 guideline departure, but to support our position that a
3 variance, for which no notice needs to be given, is
4 required in this case.
5     MR. SPEIRS: And, Your Honor --
6     THE COURT: Well, let me say this. If the
7 Government wants to respond to this report, I'll give
8 you an opportunity to do so. I can just reschedule the
9 sentencing. But to me it would be fair to the
10 Government to let them know if you're going to put on an
11 expert witness.
12     In short, I think it's something as simple as
13 the golden rule. Would you like the Government to call
14 an expert witness on your client's mental competency
15 without putting you on notice first?
16     MR. BUTLER: All I can say in response to
17 that, Your Honor, is that we regularly and routinely
18 deal with Government witnesses that are called to relate
19 hearsay testimony and expert opinions at evidentiary
20 hearings with --
21     THE COURT: Well, you put it in writing so I
22 don't have to decide who said what to whom. Do it in
23 writing in the future. But just be careful, just do
24 with them what you would expect them to do to you. I
25 think that's just the bottom line here.

Page 81

1     But if the Government wishes to respond to
2 this, I'll give you a chance to respond.
3     The second matter I wish to raise is that I
4 want to revisit an issue that I'm still disturbed about,
5 which is this woman has never been required to pay the
6 money back, and I am somewhat concerned that if I am
7 capable of requiring full restitution, whether I should.
8     She's been sent to jail how many times?
9 Numerous times.
10     THE PROBATION OFFICER: Numerous times. I
11 can't count them off quickly.
12     THE COURT: Numerous times.
13     THE PROBATION OFFICER: I'm sorry, she's had
14 numerous convictions.
15     THE COURT: She's had numerous convictions. I
16 was looking at a report. How much actual time has she
17 spent in jail?
18     MR. BUTLER: Your Honor, I believe she's been
19 in jail now for a year and-a-half.
20     THE COURT: That's on state charges?
21     MR. BUTLER: Yes.
22     THE COURT: Before that I see where she was
23 sentenced to three years, and then it would be
24 suspended. But how much actual time has she spent in
25 jail?

Page 82

1    MR. BUTLER: I'm guessing it's less than about
2  two years.
3    THE COURT: Two years total?
4    MR. BUTLER: Approximately two years.
5    THE COURT: And I don't see where she's ever
6  been required to pay the money back. To really pay the
7  money back. And I get the feeling that serving time in
8  jail is fine, but requiring her to pay the money back
9  may be something that she just needs to confront. And
10  you want her to pay nine thousand dollars back, but
11  she's getting away with, if the relevant conduct is
12  correct, thirty thousand dollars. That's the message
13  she gets from this Court.
14    I could spend a year or two to serve in jail,
15  but I'd also have to pay the money back. I just have
16  some concerns about that. I think she should own up to
17  her conduct. I read Mr. Goseley's report, and his
18  report cuts two ways.
19    MR. BUTLER: I understand that as well, Your
20  Honor.
21    THE COURT: He had some pretty strong language
22  in here about how she is manipulative and indulgent,
23  narcissistic and impulsive and blames others.
24    MR. BUTLER: I'm aware of that.
25    THE COURT: She's never better been required

Page 83

1  to own up to her conduct.
2    But I will hear from him, but one of the
3  reasons I want to hear from him is because I want to
4  find out whether I need to revisit this issue of
5  restitution.
6    MR. BUTLER: Understood.
7    THE COURT: I know you all have agreed to nine
8  thousand dollars, but that doesn't mean I've accepted
9  it. You'll notice I didn't say I agree to your
10  stipulation.
11    But anyway, let me hear from this expert.
12    If you want to respond, I'll let you do that.
13    MR. SPEIRS: Thank you, sir.
14    D A V I D   G O H S T L Y,
15  the witness herein, having first been duly sworn or
16  affirmed to tell the truth, was examined and testified
17  as follows:
18    DIRECT EXAMINATION
19    BY MR. BUTLER OF DAVID GHOSTLEY:
20  Q  Could you state your name and spell your last name
21  for the record.
22  A  David C. Ghostly. G-h-o-s-t-l-e-y, like a ghost.
23  Q  Mr. Ghostley, at my request did you interview Ms.
24  Bridget Taylor?
25  A  Yes, I did.

Page 84

1  Q  Would you describe for the Court the focus of your
2  interview?
3  A  Yes. I did a general psychological evaluation, and
4  also checked her competency to stand trial. Her mental
5  status at the time of the offense, and her competence to
6  waive Miranda.
7  Q  We'll just go through some of that. Though Miranda
8  is not particularly at issue, do you have any doubt or
9  question as to -- Well, did your evaluation raise any
10  concerns as to whether or not she would have been able
11  to understand Miranda?
12  A  No.
13  Q  Did your exam raise any questions as to whether or
14  not she understands right from wrong?
15  A  No.
16  Q  Did your exam raise any doubt or questions as to
17  whether or not she is now competent to proceed during
18  these proceedings?
19  A  No, it did not.
20  Q  As a result of your examination, were you able to
21  make any observations regarding her present mental state
22  when viewed in the context of her, I guess the best way
23  to describe it, her rearing in life?
24  A  Yes. Her current mental state is such that she has
25  characterological deficits that impair interpersonal

Page 85

1  functions.
2  Q  You used a word there, could you say that one more
3  time?
4  A  Characterological deficits. It's all about
5  interpersonal functioning. Impaired in her personal
6  functioning.
7    She also has -- was currently depressed, but
8  suffers from bipolar disorder, which is the old name for
9  that was manic depression. She has periods of time
10  where she go goes with little sleep for periods of, you
11  know, four to five days. She's got marked impulsivity.
12  In other words, acting without considering the
13  consequences of her actions. These two, the going
14  without sleep, the impulsivity, these are two hallmarks
15  of this very difficult disorder called bipolar
16  disorder.
17  Q  Do you think that that disorder and her impulsivity
18  may in any way be exacerbated by abuse that she may have
19  received?
20  A  Yes, but I actually feel my conceptualization, I
21  feel like her raising was the pathology in her character
22  was exacerbated by the bipolar disorder, particularly
23  during periods where she would go without sleep for long
24  periods of time, the impulsivity and trying to satisfy
25  this need to please relatives, others. To be loved by

Page 86

1 them. To show them love.
2 Q And maybe this shows my limitations, but what I
3 think you're saying is Miss Taylor has a mental illness,
4 bipolar disorder.
5 A Yes, exactly.
6 Q Which was exacerbated and/or affected by the way
7 she was raised?
8 A Yes.
9 Q By that I mean, and correct me if I'm saying
10 anything incorrect, whereby some people who are raised
11 in circumstances like hers might express a need to
12 satisfy or please their parents by bringing home a card
13 that they made, she as a result of the bipolar aspect of
14 her mental psyche would try to get a mink coat. I'm
15 exaggerating, but something exaggerated to show --
16 A Yes, as influenced by that mood fluctuations,
17 particularly in mania.
18 Q And when in that manic state, I think that's the
19 proper expression, though people understand right from
20 wrong in the general context, would they be prone at
21 times to maybe stretch the rules, bend the rules in
22 order to satisfy the mania?
23 A Yes. Try to get away with something, yes.
24 Impulsivity, mm-hmm.
25 Q Therefore, around the holiday times if you, for

Page 87

1 instance, could only get your children or could afford
2 to get your children a small toy, a person suffering
3 from bipolar disorder with a combination of some
4 psychiatric scarring from being raised improperly, might
5 engage in exacerbated or criminal activity to try to
6 satisfy the need to get their children --
7 A Yes, that's right.
8 Q Is Ms. Taylor's history consistent with a person
9 who is acting in that way?
10 A Yes.
11 Q Therefore, though she may know that she's doing
12 something wrong, her mania and/or mental illness would
13 -- she would justify it in the her head some way, or she
14 would not be able to control her impulse to get
15 something nice for her children, regardless of her
16 finances?
17 A That may be what happened. It's hard to say
18 exactly what occurs, but these sorts of problems,
19 overspending, impulsivity, emptying out bank accounts,
20 stealing, those types of things are common with bipolar
21 disorder, particularly with mania. And then with her
22 need to be loved and to love others in a pathological
23 way --
24 Q When you say "pathological," what is that?
25 A Well she, you know -- Her family today talked about

Page 88

1 how there was something wrong. They couldn't put their
2 finger on it but they knew something was wrong in the
3 way that she related with others. Always craving her
4 adoptive or her stepmother's attention. Just going
5 overboard in these ways. This continued on into her
6 adult life, and is a factor that's present in her
7 criminal behavior.
8 Q You also mentioned, and the Court properly
9 recognized, I think you used the word narcissistic
10 behavior. Could you describe that in the context of who
11 she is?
12 A Yes. This was a part of the M. M. P. I. results.
13 The narcissistic behavior showed up there.
14 Q You said "M. M. P. I," what does that mean?
15 A Yes, that's a psychological test that's given to
16 the individual being examined. It's a five hundred and
17 sixty-seven true or false question instrument that's
18 used to assess psychological functioning. The results
19 of that test is what suggests narcissistic sorts of
20 behavior.
21         Narcissistic, the old -- the name is derived
22 from a god who looked in the water and fell in love with
23 his reflection, and so a lot of times people who have
24 this disorder think of themselves first and not others.
25 I don't see Bridget as having the narcissism as much as

Page 89

1 the test suggested. She is more out to please others
2 than she is herself. So that's sort of -- That did come
3 out in the test results, but it didn't come out in my
4 final summary of her case in the examination.
5 Q Are these tests a hundred percent accurate?
6 A No.
7 Q I mean, part of psychiatric evaluation is to give
8 tests and then also to observe and give assessments
9 based on what you're able to see, learn and observe,
10 correct?
11 A That's correct.
12 Q And, therefore, though the test is showing
13 narcissistic -- some level of narcissism, it is your
14 position based on your observations as well as what was
15 testified to here today, that there is an overwhelming
16 need for her to please but it is to please others.
17 A That's correct.
18         THE COURT: I thought you meant the
19 narcissism, though, to be mainly an inability to
20 appreciate when she steals the damage she is doing to
21 others. I know she's trying to please her family, but
22 at the same time in that sense she is pleasing her
23 family and herself. I think the narcissism, if I
24 understood it from your report, is her inability to
25 recognize that she's hurting other people when she

Page 90

1  steals.
2      THE WITNESS: In that context --
3      THE COURT: She's pleasing whom she wants to
4  please, rather than taking into consideration the full
5  picture that she's harming other people by stealing.
6  And I thought that's what you meant by the narcissism.
7      THE WITNESS: That would be a legitimate
8  thought. I'm not sure that she was even thinking about
9  the idea that she was hurting anybody when she took the
10  money. I don't know about that part of it.
11 Q  I mean you can't be inside of her head, but based
12  on your observations, based on your interviews with
13  family members, do you believe that she thinks about who
14  she is hurting when she engages in some criminal
15  activity?
16 A  No, I don't.
17 Q  The Court will make an ultimate decision as to what
18  is the appropriate remedy in this case. Given your
19  professional experience, do you think a term of custody
20  is appropriate?
21      MR. SPEIRS: We would object to that, Your
22  Honor.
23      MR. BUTLER: I'll rephrase it.
24 Q  Do you believe that Miss Taylor should undergo
25  psychiatric counseling?

Page 91

1 A  Yes.
2 Q  Do you believe that --
3      THE COURT: She's going to get that. That's
4  going to be a condition. You don't have to convince me
5  of that.
6 Q  Do you believe, given what you have been able to
7  observe, that a custodial setting would be detrimental
8  to her mental health?
9      MR. SPEIRS: I object to that, Your Honor.
10      THE COURT: Overruled.
11 Q  To her mental health.
12 A  I think it would slow any kind of recovery or
13  remediation. She needs treatment. I think it would be
14  good for her to get out in the environment in the which
15  she plans to operate, get treatment and go about her
16  life.
17 Q  Thank you. Nothing further.
18      THE COURT: Why can't her treatment include
19  being held accountable for her conduct?
20      THE WITNESS: Now I believe she should be held
21  accountable for her conduct, otherwise she won't learn.
22      THE COURT: Why shouldn't that include what
23  everybody else does when they steal? You go to prison
24  if you steal. Why should she, if she's going to learn
25  to be accountable, why should she be excused from that

Page 92

1  penalty?
2      THE WITNESS: As a former prison psychologist
3  I understand that a punishment of up to three years,
4  after that people don't learn any more from being
5  incarcerated. And I feel -- I thought she had three
6  months already. I feel like she's probably learned as
7  much as she's going to learn from being incarcerated at
8  this point. However, I think the idea of requiring
9  restitution that you have is compelling and I would
10  recommend it as far as learning.
11      MR. BUTLER: Nothing further.
12      THE COURT: Cross?
13           CROSS EXAMINATION
14      BY MR. SPEIRS OF DAVID GHOSTLEY:
15 Q  Doctor, I'm a bit confused about what you just
16  said, that punishment after three years people don't
17  learn anything any more?
18 A  After three years of incarceration, the
19  incarceration as a tool to teach, it has no more
20  effectiveness than it does at the thirty-six months.
21 Q  So you can make that blanket statement for every
22  single defendant that's ever been in jail or might go to
23  jail, that they have no more capacity to learn from the
24  wrongfulness of their behavior after thirty-six months?
25 A  I don't think I could do that, but I could just say

Page 93

1  that that's the results -- that's a result of a study
2  that was conducted.
3      THE COURT: I'm not sure what you mean by
4  that. You say that after three years or thirty-six
5  months your capacity to learn, learn what?
6      THE WITNESS: To learn from the penalty of
7  incarceration is no more powerful at forty-eight months
8  or sixty months or seventy-two months, whatever the
9  sentence is. There is no more teaching power. There is
10  no more effectiveness to a longer sentence, in other
11  words.
12 Q  But you mean that in general. You don't know what
13  the effects specifically will have on this defendant.
14 A  That's true.
15 Q  And, Doctor, on page eight you say in your report
16  "She is manipulative," this is in the first paragraph,
17  "and may resort to intimidation or aggression to get her
18  way." That's in your report, correct?
19 A  That is also, I believe a part -- oh yes, yes.
20 Q  The very last line of the first paragraph on page
21  eight.
22 A  That's correct.
23 Q  And, sir, that means when you say she may resort to
24  intimidation, if I understand it, that she will bully
25  people or do things, intimidate them in order to say get

Page 94

1 some kind of gratification.
2 A  Yeah, in order to get her way perhaps, yes, that's
3 right.
4 Q  And, do, there is no doubt about the fact that she
5 knows right from wrong, correct?
6 A  That's true.
7 Q  And there is no doubt about the fact that someone
8 who is manipulative may feign acceptance or
9 responsibility, and may feign any type of accountability
10 for their action?
11 A  Yes, absolutely.
12 Q  And indeed having this particular defendant pay
13 back everything that she has taken would be the only way
14 to really know for certain or to demonstrate her remorse
15 for these crimes.
16 A  I think that's a very good way, yes, to pay back.
17 Q  Thank you.
18          REDIRECT EXAMINATION.
19       BY MR. BUTLER OF DAVID GHOSTLEY:
20 Q  A couple of more questions.  To clarify the Court's
21 point, and I think it's a good one, being placed in jail
22 you can take a lesson from that; that is, going into
23 jail can teach someone the error of their ways.
24 A  Yes, absolutely.
25 Q  And you're not sitting here saying that jail does

Page 95

1 not serve any type of learning and/or deterrent effect?
2 A  Not at all.
3 Q  It is your position, though, that after a certain
4 amount of time, any learning benefit that you're getting
5 from being --
6 A  Correction, you might call it.
7 Q  Correctional behavior you're getting no longer
8 exists.  There is a learning curve?
9 A  That's right.
10 Q  And it just kind of levels off and you get nothing
11 else out of it.
12 A  Mm-hmm.
13 Q  In this case, given the fact that she's been in
14 state custody for approximately thirty months, do you
15 think an additional term of let's say thirty months in
16 custody would have any additional correctional benefit
17 for Ms. Taylor?
18 A  No.
19       THE COURT:  She's been in jail for thirty
20 months for what?
21       MR. BUTLER:  Your Honor, it was a state
22 charge, I believe it was check fraud.
23       THE PROBATION OFFICER:  Criminal possession of
24 fraudulent instruments, several counts, as a result of
25 being revoked from Probation.

Page 96

1       THE COURT:  She was revoked from probation on
2 these other offenses?  Didn't she go to jail on them
3 previously?
4       THE PROBATION OFFICER:  Some of her sentences
5 have been reversed splits and some of them have been
6 average spit sentences.
7       THE COURT:  That's right.  She didn't serve
8 any time previously prior to these thirty months?
9       THE PROBATION OFFICER:  Yes, sir, she had a
10 two year sentence in the state of Oklahoma.
11       THE COURT:  And she served how much time on
12 that?
13       THE PROBATION OFFICER:  She served from May
14 tenth, ninety-four to January six, ninety-five.  Not a
15 whole year.  That was for grand larceny.
16       THE COURT:  Any other time actually in jail?
17       THE PROBATION OFFICER:  Sixty days in nineteen
18 ninety-three for shoplifting.  And then when she came to
19 Montgomery County we started with the split sentences
20 for the criminal possession of forged instruments.
21       THE COURT:  Is that what she's serving now?
22       THE PROBATION OFFICER:  That's what she is
23 serving now as a result of a revocation.
24       THE COURT:  Did she serve any of the split
25 sentence before revocation?

Page 97

1       THE PROBATION OFFICER:  Let me read further,
2 sir.
3       No, sir.  On those reverse splits, what they
4 do is they give you the probation phase first, and if
5 you mess up during probation then you're revoked to
6 serve the time.
7       MR. BUTLER:  Maybe I misunderstood the
8 Government's question.
9 Q  Do you believe that during your interview, Ms.
10 Taylor was giving you -- was lying to you or being
11 manipulative?
12 A  I don't think so.
13 Q  Your conclusions is that she can be manipulative
14 and she can lie.
15 A  Yes.
16 Q  However, based on your interview with her, do you
17 believe she accepts responsibility for her criminal
18 conduct in this case?
19 A  Yes.
20       THE COURT:  When has she received
21 psychological help?  I know that her stepmother said she
22 received it when she was little.  Any since she's been
23 an adult?
24       THE WITNESS:  Yes.  She was -- Now she hasn't
25 been taking counseling so much as an adult, but she has

Page 98

1 been prescribed psychotropic medication. In fact, just
2 at the beginning of her time here in Autauga County Jail
3 she was prescribed an antidepressant. My report should
4 have a psychiatric history. It's right on page two.
5     THE COURT: Is she taking the medicine now?
6     THE WITNESS: No, she isn't taking
7 psychotropics now.
8     THE COURT: Why not, do you know?
9     THE WITNESS: She had trouble sleeping when
10 she was prescribed the metazapine, I believe it was, and
11 discontinued it so she could sleep. Oh, I'm sorry, it
12 was Paxil that was discontinued so she could sleep.
13 Q Paxil, though, isn't an antipsychotic.
14 A It's an antidepressant, a specification serotonin
15 re-uptake inhibitor.
16 Q I forgot to ask you this. Did you believe or
17 observe or reach any conclusions as to whether or not
18 any of Miss Taylor's behavior may be motivated out of
19 fear of being similar to anyone, her mother
20 particularly?
21 A Yes. In fact --
22 Q I don't think I asked that well. Could you
23 describe what your findings were as to that point?
24 A Yes. Well, in fact she has been worried that she
25 may be suffering from a mental illness for some time,

Page 99

1 and she's been reluctant and really has refused to be
2 evaluated because of this and her fear of losing her
3 children. In fact her husband, who I interviewed,
4 reported that one day she just disappeared and the
5 family, I believe, thought she may be dead because she
6 hadn't told anyone where she was for a couple of years,
7 I believe is what he said. This is not normal behavior,
8 obviously.
9 Q Do you believe that avoidance of some of the
10 matters which she's gotten into trouble for may stem
11 from that and, for instance, this judge's requirement
12 that she face the mirror and whether or not she has any
13 mental health problems?
14 A Avoidance of a psych eval?
15 Q Yes, and recognition of whether or not she has or
16 does not have any psychiatric problems.
17 A Pertaining to what again? I'm sorry.
18 Q Whatever she's scared of. Let me rephrase that.
19     Has Miss Taylor acted to avoid psychiatric
20 assessment.
21 A Yes.
22 Q Why has she done so?
23 A I think she's paranoid of being found out or
24 discovered of being like her mother, of losing her
25 children. It's a whole host of things that could be

Page 100

1 influencing her there.
2 Q At this time, do you believe that she is suffering
3 from any mental health problems other than bipolar
4 disorder, other than what's been reported in your
5 report?
6 A No, but I did not mention posttraumatic stress
7 today, and that's something that I'm sure seems to be
8 bothering her. She has obtrusive thoughts about some
9 sexual abuse and that sort of thing that occurred when
10 she was a child. Nightmares, this type of thing.
11 Q Would she benefit from psychiatric counseling?
12 A Absolutely, yes.
13 Q Does any mental health problems she suffers from
14 now create any potential for physical harm to herself or
15 others that you can see, physical harm?
16 A She does have a history of suicide ideation with
17 one attempt, but no current intent which, you know,
18 elevates her risk somewhat.
19 Q If as a result of the sentence in this case she
20 receives psychiatric treatment, is the possibility of
21 her trying to cause harm herself or others reduced?
22 A I would hope so.
23 Q Nothing further, thank you.
24     THE COURT: Anything further?
25     MR. SPEIRS: Two questions, Your Honor, very

Page 101

1 briefly.
2     RECROSS EXAMINATION
3     BY MR. SPEIRS OF DAVID GHOSTLY:
4 Q Doctor, you will agree with me that basically
5 Miss Taylor has a fifteen year history of criminal
6 behavior starting in about nineteen ninety?
7 A Yes.
8 Q And, Doctor, there is absolutely no guarantee that
9 whatever counseling or psychological assistance she
10 gets, there is no guarantee that once she's released
11 that she won't reoffend, isn't that correct?
12 A There is no one hundred percent guarantee.
13 Q Thank you.
14     MR. BUTLER: We'll stipulate to that, Your
15 Honor. Nothing further.
16     THE COURT: Thank you.
17     (Whereupon the witness, David Ghostley,
18 stepped down from the stand.)
19     MR. BUTLER: One moment, Your Honor, I may be
20 done.
21     (Whereupon, Mr. Butler conferred with the
22 defendant off the record.)
23     MR. BUTLER: Nothing further, Your Honor.
24     THE COURT: Anything else from the Government?
25     MR. SPEIRS: Your Honor, the Government just

Page 102

1 had one concern. I just want to make sure the
2 Government's position is clear. The Government has
3 never limited itself in this case to the amount of
4 restitution. I think the Court -- we talked about the
5 stipulation earlier. The Government is only keying upon
6 what it is that Probation finds is an appropriate amount
7 of restitution. And I just want to make sure I
8 understand our stipulation correctly; that the
9 Government is not saying that there is any particular
10 number tied to restitution, it is tied to what Probation
11 finds is an appropriate number.
12     MR. BUTLER: Your Honor, maybe I can just
13 classify this. It's my understanding that the parties
14 are agreeing that the restitution figure submitted by
15 Probation, as well as the amount of loss figures
16 submitted by Probation, is accurate. Neither party is
17 agreeing that that figure is binding on the Court in any
18 way.
19     Is that fair enough?
20     MR. SPEIRS: I think that's fair enough, Your
21 Honor.
22     CLOSING ARGUMENTS:
23     THE COURT: Okay. Any argument you'd like to
24 make?
25     MR. BUTLER: Yes, Your Honor.

Page 103

1     Your Honor, it's our position that -- Well
2 Miss Taylor is an individual who went through a
3 childhood that no one should have to go through. The
4 Government does have a point, a valid point, that not
5 everyone has an idyllic childhood. In fact, most people
6 do not. It is our position, however, that Ms. Taylor's
7 childhood was far less idyllic than most people.
8     Miss Taylor was physically abused by her
9 mother. She was burned. She was humiliated at school.
10 It appears that her older sister, her wrist was broken
11 by her mother. Her mother was a paranoid schizophrenic
12 raising three children. That is about as frightening as
13 it gets. Ms. Taylor was forever scarred by that.
14     Operating at the same time as this hellish
15 childhood was a young lady who was suffering from mental
16 illness. Bipolar disorder. A disorder which caused her
17 to want to please her mother and others to a far more
18 exaggerated extent than most people. When you couple
19 the fact that she has a parent who is showing absolutely
20 no kindness or caring towards her, with the fact that
21 she's suffering from a disorder whereby she wants to be
22 and demonstrate her love and receive love in an
23 exaggerated state, it's a collision of perfect
24 proportions, for lack of a better word.
25     That is the backdrop which this criminal

Page 104

1 history starts to develop. This criminal history starts
2 to develop as this young woman suffering from a mental
3 illness, scarred permanently by a mother, starts to
4 mature. She wants others to care for her. She wants to
5 demonstrate love for her Mom and others in an
6 exaggerated state. She starts to engage in criminal
7 activity to satisfy this.
8     The Court pointed out that for the last
9 fifteen years she's been engaged in criminal conduct. I
10 would actually state, Your Honor, that it goes back even
11 further than that. I think the criminal conduct started
12 and began when she moved in with her stepmother, a woman
13 who to this day stands by her and supports her. She
14 started to steal from her in order to try to please
15 someone else, that is her biological mother.
16     She would do extraordinary things to try to
17 please that stepmother as well. Whatever it took to
18 please people, she would do without understanding of the
19 consequences. She's a grown woman now, and she's aware
20 of this behavior. But this is a behavior which she will
21 always have to fight her entire life. There is no
22 counsel is right, there is absolutely no guarantee that
23 Ms. Taylor will never engage in criminal activity.
24     All we can do is what is being done here, is
25 present the Court and try to demonstrate to the Court

Page 105

1 that there is family and friends, as are present here,
2 who are willing to stand by and do what they can to
3 assure that she does not reoffend. She has been in
4 custody for thirty months.
5     THE COURT: You know, having listened to your
6 expert's testimony, and having listened to the testimony
7 of the defendant's stepmother and sister and father, I'm
8 still concerned about the fact that we're not dealing
9 with someone here that just on the spur of the moment
10 decided she wanted to please her family and buy
11 Christmas gifts. Here's a woman who over a period of
12 time engaged in a fairly elaborate scheme to just simply
13 defraud people.
14     She used false names, and false Social
15 Security numbers. And we're not talking about nickel
16 and diming, we're talking about thousands of dollars
17 that she stole in an elaborate fraudulent scheme. She
18 would use a name and pretend she was a student and all
19 of this and get this money. To some degree it would
20 appear that maybe she was impulsive, but if she was
21 impulsive she was impulsive for a very long time.
22     I'm just having trouble with the magnitude of
23 her scheme when you try to fit it into the notion that
24 she was trying to help others and she was purely trying
25 to influence others and so forth.

Page 106

1    MR. BUTLER: Addressing that, Your Honor, a
2  couple of things. One, I've had the opportunity of
3  working with Ms. Taylor over probably the last five
4  months. She will address the Court.
5    Ms. Taylor is an extremely bright woman.
6  Extremely bright. But it has been my experience that
7  individuals who are bipolar, often schizophrenic, are
8  just that, extremely bright people. Her mind is always
9  working. The scheme is not just, you know, going in
10  there and taking money out of a tip jar, it involves
11  altering Social Security numbers, sending things off,
12  getting things back. For lack of a better word, that's
13  not very hard for Ms. Taylor to do.
14    THE COURT: She had to plan this. This is
15  quite elaborate. I wouldn't even know how to do what
16  she did.
17    MR. BUTLER: Your Honor, the record may
18  actually reflect this. Your Honor I'm sure has Ms.
19  Taylor's record up there. You'll see submitted by Ms.
20  Taylor, I would say maybe five or six pleadings and/or
21  letters from Ms. Taylor. Ms. Taylor is a bright person
22  who will submit to the Court and write to the Court to
23  address issues and points that she thinks are necessary
24  to be addressed.
25    Her coming up with and/or figuring out this

Page 107

1  scheme in my mind, though the scheme is complicated and
2  most people wouldn't know how to do it, would be second
3  nature to Ms. Taylor. She can take a look at a
4  situation, size it up real quickly and determine that's
5  where an opportunity can be -- well this is how I can
6  operate a scheme here and put it into play.
7    That in my mind, at least as to Ms. Taylor,
8  does not demonstrate some very elaborate scheme to
9  defraud and/or get over, it's just she sees this
10  opportunity, she wants to please, this is where she can
11  get the money and she did it. It's all second nature,
12  and she's been doing it since she was a child. She
13  finds where there's an opportunity for funds and she
14  gets it. She does this to please others. The scheme,
15  though the Court observes it as complicated, was not
16  complicated to Ms. Taylor.
17    It is our position, Your Honor, that
18  incarcerating her any further will serve no benefit in
19  this case. The guideline range here is I believe
20  twenty-seven to thirty-three months and the recommended
21  sentence is thirty months. Ms. Taylor has done thirty
22  months plus in state custody on unrelated charges. It
23  is our position that any --
24    THE COURT: She was revoked based on the
25  conduct that's involved in this case?

Page 108

1    THE PROBATION OFFICER: No, sir.
2    THE COURT: Revoked based on other conduct?
3    THE PROBATION OFFICER: I think it was ongoing
4  -- Let me see if I can pull it up. It's a violation of
5  her state probation but not because of the instant
6  offense. Probably other state charges. As a matter of
7  fact, I know there is another state charge for criminal
8  possession of a forged instrument noted in paragraph
9  thirty-five of the report.
10    THE COURT: I understand people who for
11  instance write bad checks. They act on impulse. But as
12  I said, I'm concerned about the breadth and complexity
13  of her conduct. It doesn't sound like something she
14  just at the last minute decided to do, but something she
15  actually planned.
16    MR. BUTLER: I just want to add this one last
17  point to that. If Your Honor takes a look at it, and
18  the Government counsel and Probation were discussing it,
19  this is the same conduct that was going on since
20  nineteen ninety-two, ninety-three. She figured this out
21  ten years ago and just kept doing the same thing.
22    THE COURT: Probably part of the problem is
23  she just got away with it for a very long time.
24    MR. BUTLER: She finally figured it out back
25  in ninety-two, ninety-three. She was getting away with

Page 109

1  it. It was an easy way for her to make money, not
2  because she was reassessing the plan each year, she just
3  did the same thing she did last year. They didn't catch
4  me, I'll keep doing it and it built up.
5    I believe any punishment effect, any
6  punishment is satisfied as a result of the state case.
7  We would ask the Court, whatever its finding as to
8  restitution, Ms. Taylor will pay that restitution
9  amount.
10    THE COURT: Well finding the restitution, I
11  said if I was going to require more than nine thousand
12  dollars I would give you all an opportunity to brief it,
13  to let me know whether I can do it or not. I found one
14  case that suggests I can do it, but I haven't had a
15  chance to digest the case itself.
16    MR. BUTLER: Assuming the Court does have that
17  authority, we're going to pay it back. We're not here
18  trying to dodge that. I thought, as the Court did,
19  there are some issues whether it could be ordered. But
20  if it can be ordered, we're going to pay it.
21    The issue here that we'd like to underscore is
22  what the appropriate custodial sentence is. We would
23  ask the Court to consider the following. Ms. Taylor is
24  scheduled for release from state custody in July. We
25  would ask --

Page 110

1    THE COURT: July of this year?
2    THE DEFENDANT: Yes.
3    MR. BUTLER: We would ask the Court to impose
4  a sentence beginning today, or at whatever time the
5  Court imposes sentence, to run concurrently with that
6  state sentence. And that once she is released from the
7  state, she is released on state probation. She'll be
8  released, I believe, on state probation, and she'll also
9  have federal probation.
10    THE COURT: So in effect I would require her
11  to make full restitution, and the sentence I would give
12  her today would run concurrent with the state sentence
13  up through July of two thousand seven.
14    MR. BUTLER: Yes, Your Honor.
15    THE COURT: And the bottom line is, she would
16  receive no punishment whatsoever for the conduct that
17  she has performed over the last fifteen years.
18    MR. BUTLER: Your Honor --
19    THE COURT: She'd just be like anybody who is
20  civilly liable. She wouldn't serve an hour, a moment, a
21  second for the criminal conduct that she's engaged in
22  over the last fifteen years. Is that the message I
23  should give her?
24    MR. BUTLER: Your Honor, I don't think that
25  that was the message that would be being sent.

Page 111

1    THE COURT: What other message would I send if
2  she got out in July of two thousand and seven out of
3  state custody, and she'd get out of my custody at the
4  same time as the state, what other message would I be
5  sending her?
6    MR. BUTLER: Your Honor, the message that I
7  believe would be sent would be the following. And we
8  may stipulate to this fact to maybe eliminate the
9  concern. Number one, you want every dime of this money
10  paid back. And we may stipulate to a higher restitution
11  figure to eliminate any additional research on that
12  point if the parties can agree that this would be an
13  appropriate resolution, number one.
14    Number two, Your Honor, I have practiced
15  before this Court regularly. I don't think this Court
16  would have any hesitation whatsoever putting her in
17  jail, and I believe the statutory max in this case would
18  be three years, if she didn't pay back a parking ticket.
19  If she related the conditions of her parole in any way,
20  shape or form.
21    It is my position that the fact that she will
22  go to jail in all likelihood, the Court could never
23  prejudge, but in all likelihood will go to jail based on
24  this Court's common practice if she violated the
25  conditions of her supervised release again.

Page 112

1    THE COURT: Would it be a stronger message if
2  I let her know it up front, that I mean what I say, if I
3  send her to jail up front?
4    MR. BUTLER: Well, Your Honor, absolutely, and
5  it has been my practice, I don't know if Your Honor
6  needs to say that, Your Honor will put her in jail if
7  she violates. I know based on practice that if Your
8  Honor would. But yes, it would send a strong message.
9    But we would ask, Your Honor, to impose a
10  sentence to run concurrent with the remainder of her
11  state sentence with the condition, and we would
12  stipulate and agree to pay back restitution in the
13  complete amount of forty-six thousand dollars with the
14  condition of course that she be placed on supervised
15  release with any and all conditions that Probation and
16  the Court deems appropriate. With the understanding
17  that the simplest of violations, while on supervised
18  release of either her state probation conditions or her
19  federal, would amount to violations of her supervised
20  release in this Court's order and the likelihood of her
21  facing imprisonment is almost certain.
22    That's what we would ask for, Your Honor. In
23  the alternative, Your Honor, we would ask for a sentence
24  of a year and a day to run concurrent with the state
25  sentence, and that that sentence run beginning at the

Page 113

1  imposition of sentence today as an alternative with the
2  condition of course that supervised release follow.
3    THE COURT: What's Probation's position on the
4  appropriate sentence here?
5    THE PROBATION OFFICER: Your Honor, the
6  guidelines require that we give a reasonable incremental
7  punishment for the instant offense conduct. That
8  conducting being within a range of twenty-seven to
9  thirty-three months. And that is what I'm recommending,
10  the midrange of that guideline.
11    THE COURT: So you stick by your
12  recommendation?
13    THE PROBATION OFFICER: Yes, sir, I do.
14    THE COURT: What is the Government's position
15  on an appropriate sentence?
16    MR. SPEIRS: Your Honor, we think thirty
17  months is appropriate and is what the Government agreed
18  to. It's the Government's position that if she were to
19  be sentenced today, that her time --
20    THE COURT: Concurrent or consecutive to her
21  state sentence?
22    MR. SPEIRS: Under the plea agreement that it
23  would be concurrent. The time would run concurrent
24  until she E. O. S.'s from the state. She would go from
25  the state, then finish out the remainder of her thirty

Multi-Page

Page 114

1 months in federal custody.
2     THE COURT: So whatever sentence I gave her
3 would run concurrent with the state sentence. So she
4 would essentially get time on her federal sentence for
5 any state time she has remaining, is that correct?
6     MR. BUTLER: Whatever sentence Your Honor
7 would impose, minus six months. The best way to look at
8 it is six months of that is going to run concurrent with
9 the state sentence.
10     THE COURT: And is that what you're
11 recommending? Is that what I understood you to be
12 recommending?
13     THE PROBATION OFFICER: That would be fine.
14 That's not what I was recommending because I did not
15 read the plea agreement to state that. What exactly
16 this plea agreement read, I thought, and I have to look
17 at my notes here, is that the parties agreed that any
18 sentence imposed for the instant offense shall run
19 concurrently to any time remaining on the defendant's
20 state sentence for similar or related fraud charges.
21 And these are not similar or related fraud charges.
22 That's what I read the plea agreement to mean.
23     MR. BUTLER: That is what is written in the
24 plea agreement, Your Honor.
25     THE COURT: I have some difficulty

Page 115

1 understanding how these are similar or related.
2     MR. BUTLER: Your Honor, it's our position
3 that they are not related, but they are similar in that
4 they are fraud and -- they're reflective of the ongoing
5 series of fraudulent conduct that Ms. Taylor has engaged
6 in over the last --
7     THE COURT: What were the state charges for?
8     MR. BUTLER: Bad checks, Your Honor. Forged
9 instruments.
10     THE COURT: They were stolen checks in some
11 instances, weren't they?
12     MR. BUTLER: Yes, Your Honor.
13     THE PROBATION OFFICER: And stolen credit
14 cards and stolen debit cards as well.
15     THE COURT: Yes? So what's the Government's
16 position on this? You agree that it's related conduct?
17     MR. SPEIRS: Well to the extent that we have
18 perhaps some forgeries, Your Honor, but for falsifying
19 information on checks, it's the Government's position
20 that if that is the substance of the state charge,
21 things that have been forged, false names, false Social
22 Security numbers, that her federal sentence ought to run
23 concurrent with those charges. That's what the intent
24 of the parties was in my understanding, Your Honor.
25     THE COURT: When you entered into the

Page 116

1 agreement, did you know what state charges were?
2     MR. SPEIRS: I don't think I knew. I knew
3 there was some type of fraudulent or forged documents.
4     MR. BUTLER: Your Honor, Ms. Taylor would like
5 to address the Court.
6     MR. SPEIRS: Your Honor, might I?
7     THE COURT: Yes, go ahead.
8     MR. SPEIRS: Your Honor, I think it's
9 important to understand basically in addition to Mr.
10 Butler's argument what their own witness, what their own
11 expert said, that Ms. Taylor is manipulative. And, Your
12 Honor, I think understanding that, it's hard to really
13 know what is going on with Ms. Taylor.
14     I'd like to draw this Court's attention, the
15 Court recently adjudicated a young man by the name of
16 Artimus Terry. And Mr. Terry was a very young man that
17 had a very difficult background, was bounced around
18 through the system, the State of Alabama's --
19     MR. BUTLER: Your Honor, to the extent the
20 Government wants to reference another case I would
21 object, simply along the lines that sentencing is
22 individual. The Court will make an assessment based on
23 the facts and circumstances --
24     THE COURT: I'll let him speak metaphorically.
25 Go ahead.

Page 117

1     MR. SPEIRS: And, Your Honor, the Court may
2 remember the amount of time that was spent discussing
3 Mr. Terry's background. He is a young man that had a
4 very difficult upbringing and he leveled a shotgun at a
5 police officer. And the Court went through great pains
6 to look at how he was brought up and the difficulties
7 that he had.
8     This case pales in comparison to that case,
9 Your Honor. This is a person that although she did have
10 difficulties with her mother, obviously had a certain
11 amount of a support system, and as the Court has already
12 noted had a very complex scheme that she managed to
13 manipulate numbers and different types of creditors and
14 all these different types of organizations in order to
15 get money. That's a very different situation than what
16 this Court found in Artimus Terry.
17     The difficulties -- And the Government tried
18 through its cross examination to highlight that
19 everybody may have a difficult family situation. And
20 this Court has looked at that situation in Mr. Terry's
21 case, and this is a completely different situation. And
22 frankly, Your Honor, in the Government's opinion, it
23 doesn't warrant the same treatment.
24     MR. BUTLER: Your Honor, just briefly before
25 Ms. Taylor addresses the Court. I don't know the

Page 118

1 Artimus Terry case. I'm not --
2          THE COURT: To be honest with you, I can't
3 quite remember it myself, so we're in the same boat on
4 that. But what is your response otherwise?
5          MR. BUTLER: But otherwise I was just going to
6 say that having been somebody who is stupid enough to
7 try to relax his hair a long time ago, for the notion,
8 I'm not sure Government counsel is aware of how awful
9 this could have been or was, to have a child sitting
10 there with this lye on her hair burning her scalp to the
11 extent she wears her hair like this --
12          THE COURT: I'm not sure that justifies this
13 scheme, though.
14          MR. BUTLER: Whether or not it justifies it or
15 not, but to say she just had it rough, you know, a tough
16 little childhood, I think unfairly minimizes the drastic
17 nature of the abuse she suffered. That's all I just
18 wanted to say.
19          THE DEFENDANT: Your Honor, first I want to
20 apologize to my family and to the financial people in
21 the court. My abuse goes further than burning my scalp
22 and sitting in a highchair. I mean I went without food,
23 without lights, without water. My brothers went without
24 diapers and I had to go out and husstle and get money.
25 I have been hussling ever since I've been little.

Page 119

1          I had to go out and carry groceries, shovel
2 snow, and whatever. We had to sit in the dark. I mean
3 it's not just me being burned, there's a lot of stuff
4 that would stay with me and altered my thinking of how I
5 should provide with my family so they shouldn't have to
6 do it. I manipulated people when I wrote checks and try
7 to pass them over. That's the person I was. But as far
8 as manipulating trying to be me, I wasn't.
9          I was sheltered from people. My family is
10 there now. I was sheltered from there. I wouldn't go
11 to them and asked them for their help, because if I
12 asked them for help they would say I'm like my mother.
13 So therefore I wouldn't ask for their help.
14          I mean my husband at first was abusive, and so
15 I ran from that and I went to Montgomery to get away
16 from my husband because he was abusive. My kids recall
17 the times when my husband abused me. I thought that led
18 to my mother's condition; she was hurt for her being
19 abused or doing drugs.
20          I was locked up in Oklahoma, and I went to
21 boot camp, and at that time I stopped stealing. I
22 stopped shoplifting at that time because I learned my
23 lesson at that time. I was writing checks and I was
24 doing credit cards because it became a scheme, and it
25 was a scheme and it was means for me to get things for

Page 120

1 my kids and I was wrong. But I always worked. I always
2 worked one or two jobs. I never lived off Welfare.
3          I always worked for my kids. I never tell my
4 kids to lay up with no man or anything else. I was
5 scared to lose my children. That's all I thought for,
6 was my kids. I called the financial institution at A.
7 U. M. and let them know that I had the proper loans
8 because when I got to the county jail I was arrested and
9 I was trying to gets everything ahead and brought
10 forward. I called Miss Williams at A. U. M. and told
11 her the various loans and various numbers.
12          I used my name. And when I applied for loans,
13 I intended on paying them back, since I gave them my
14 name. I gave them either my married name or my maiden
15 name, but I switched my Social Security number. I did
16 it a number of times but never got caught. Nobody
17 pulled me to the side and said listen, you could go to
18 federal prison. I would have stopped. I didn't think I
19 could go to federal prison. I just thought they would
20 automatically let me pay it back.
21          When I talked to Ms. Williams at A. U. M. and
22 gave her the different Social Security numbers, she
23 pulled them up and she said for me to contact the
24 Department of Education. And I did that, and I spoke
25 with Mr. Lee and he said he would consolidate them. He

Page 121

1 would gather all the information and he would contact me
2 back. I never got no letter until I got at Birmingham
3 Work Release. And at that time I spoke with them and
4 they said that they would wait for my release to pay it
5 back. I never heard anything else from them.
6          I've had restitutions on the cases that I had
7 before, And I worked and paid them back. And I paid
8 monthly payments on restitution. It's that I was
9 adapted to doing that to get by and did stuff for my
10 kids. No, I didn't do stuff for myself, I did it for my
11 kids because I love my kids. And I have been away from
12 my kids for thirty months now and it hurt. Everybody
13 gets to a paint where they turn around, and I think I've
14 reached that point because I have not been there for my
15 kids.
16          My kids are in Oklahoma. I can't see them. I
17 saw them twice in the last two years. I can barely talk
18 to them because the calls are too expensive. My son
19 went to juvenile for two years and I wasn't there for
20 him, and that hurt. I wasn't able to be there for him.
21 I had my brothers. I take care of my brothers. My
22 mother put them up for adoption when I found them. And
23 I went and found them and I took of them from the age of
24 fifteen until the age they are now. They're in Georgia
25 and they're with their family. They're fine.

Page 122

1    I did things. I didn't do things to try to
2 manipulate thinking okay, I was going to jail one day so
3 I'm doing stuff now. It was just my heart, I was kind
4 because nobody was ever there for me. Yes, my family is
5 here today, but I didn't have the support then. But
6 they're here to help me now because I'm asking for it.
7 I never asked for help because I was scared. I didn't
8 want anybody to think I was a bad mother and take my
9 kids away from me.
10    Judge Greenhall ordered for me to go to mental
11 counseling, and I was just scared and didn't go because
12 I'd see people take kids all the time and I was scared
13 of losing my children. And I lost my children since
14 I've been locked up this time, and I feel I learned my
15 lesson. I took alternative thinking, I took panic
16 classes, I took Christians Against Substance Abuse. And
17 I have been paying restitution. It's just I didn't know
18 until I had to sit down as long to realize what I was
19 doing was wrong. I don't mean it.
20    And I don't want to do it no more because I
21 don't like the consequences. If I get in trouble again,
22 I can face twenty years with the state, if I get in
23 trouble one time. And then I've got the federal on top
24 of my head. So I don't plan to try to do the same thing
25 again.

Page 123

1    I don't want to do nothing again, because I
2 appreciate the small things, not the big things, not
3 trying to buy things for my kids, it's love and being
4 there with them is what I appreciate now. Tutwiler is a
5 maximum security prison. I mean it's hazardous and it's
6 about to be closed down. I ain't trying to do nothing
7 no more, Your Honor. I learned my lesson. I've never
8 been locked up away from family and my kids. I love
9 them so much.
10    And I don't know what else to say. I'm not
11 trying to manipulate the Courts or nothing else, I just
12 want to be with my kids. My daughter is about to
13 graduate form high school and I missed three years three
14 years of her school. I tried so hard to be there for my
15 kids, and I messed up. And I'm just asking for a
16 chance, Your Honor.
17    My husband, he gave up on me, because we've
18 been separated. I have been going back and forth and I
19 couldn't stop to stay out of the trouble long enough for
20 us to get back together. And this last year my
21 stepbrother passed away and he had a friend that passed
22 away. We just started realizing that life is short, you
23 know, and he -- I wanted his love back and he asked me
24 to come back to be with him. He planned to buy a house
25 and we planned to be together.

Page 124

1    I'm not trying to do no more crime. I don't
2 even want to jaywalk. Seriously, because life is too
3 short and my kids are not getting any younger. My main
4 focus was to be there for my kids and I haven't been
5 there for them this last two and-a-half years.
6    I don't know what else to say.
7    And from the beginning I told Mr. Butler I
8 don't want to argue about paying the money back because
9 I did get the money. If I've got to work two or three
10 jobs to pay it off, I'll pay it off. I'm not trying to
11 get out of paying it because I did do it. I admitted to
12 doing it. And like I said, I contacted the people at A.
13 U. M. about the loans to initiate an investigation or
14 whatever. But I called them on my own.
15    THE COURT: Why didn't you pay the money back
16 long before now? You knew you took it.
17    THE DEFENDANT: It never was in default. They
18 never sent me a letter because usually --
19    THE COURT: But you knew you took it. Why
20 didn't you pay it back long before now? You say that
21 you realized you owed them the money, and you said you
22 thought that you were just taking it but you could pay
23 it back. This all occurred back when, beginning in
24 nineteen ninety-three and it's now two thousand and six
25 and you still have all of this money outstanding.

Page 125

1    THE DEFENDANT: The student loans I was
2 getting in Tulsa, Oklahoma, they were withholding my
3 income tax and I thought the student loans were being
4 paid for. And I just was -- I don't know, Your Honor, I
5 have no real excuse why I hadn't start paying it. But I
6 know now that I have to pay it in order to go forward.
7    THE COURT: Now she's supposed to have
8 received these loans, these college loans. Was she
9 going to school at the time?
10    THE PROBATION OFFICER: During several of
11 those years, yes, sir. She has attended Alabama State
12 University and A. U. M. And I think she did briefly
13 attend Tulsa Community College as well.
14    THE COURT: But in some instances she was not
15 attending school when she got the loans.
16    THE PROBATION OFFICER: That is correct. And
17 some of these checks were for non-school related
18 expenses like room and board and groceries or what have
19 you.
20    MR. BUTLER: We're not going to get into all
21 of that because, as Ms. Taylor indicated, she stands
22 here willing to pay it all back. But I think there is
23 an issue as to, for instance, grants. If I get a grant
24 and I am enrolled in school and I use it for groceries
25 or things like that, that is allowed. We're not going

Page 126

1 to start breaking it down as to what -- we're standing
2 here ready to pay it all back because the vast majority
3 was not intended --
4      THE COURT: Anything else from anyone?
5      MR. SPEIRS: Not from the Government, sir.
6      THE COURT: Anything else from Probation?
7      THE PROBATION OFFICER: Nothing here, sir.
8      THE COURT: We'll just take a ten minute
9 recess while I decide what to do.
10      (Whereupon, a recess was taken.)
11          ORAL DECISION FROM THE BENCH:
12      THE COURT: Counsel, I have carefully
13 considered your arguments.
14      I sympathize with the defendant's background,
15 but actually her own comments raised even more concerns
16 for me. I got the strong impression from her comments
17 that she views herself as a victim, and that really
18 plays into the psychological report, that she blames
19 others. I just don't get the impression that she has or
20 is ready to hold herself fully accountable for her
21 conduct.
22      I think, unfortunately, she's heard all of
23 this in court today, she now sees herself as someone who
24 has been wronged and I don't think she appreciates the
25 wrong she's done to others fully. And she has been

Page 127

1 wronged, but she just can't steal, even though she's
2 been wronged by her mother and by others.
3      I've also considered the issue of restitution,
4 and even if I were to order forty-seven thousand
5 dollars, there is no way that she can pay that back. I
6 would even be concerned as to whether if I were to order
7 that as restitution where she would get that money from
8 as well. She might even result to illegal means to pay
9 back the restitution.
10      MR. BUTLER: Your Honor, before the Court
11 imposes sentence, and I understand the dilemmas here,
12 one, I do believe given the family support that she is
13 now reaching out for and the fact that she would have
14 two agencies monitoring her, state probation and the U.
15 S. federal probation for the first time --
16      THE COURT: Well as I said before, my concern
17 now is that I think that she views herself as a victim
18 rather than as a victimizer. In some sense she is both,
19 but she is a victimizer too. She stole. She stole lots
20 of money, and she's hurt through her thievery. I don't
21 get any strong sense of effort to really stand before me
22 and say, you know, I'm going to do this and that to pay
23 the money back. She speaks in very general terms. And
24 I rather suspect that she's said this on many occasions.
25 I don't think I'm hearing the first time that she

Page 128

1 justified her conduct.
2      I read letter psychological report very
3 closely, and that's very fitting for the person who is
4 described in that report; blaming others, justifying her
5 conduct. If she was really interested in paying this
6 money back as she tried to portray in her comments
7 earlier, she would have started paying it back ten years
8 ago. I just don't think she appreciates that she takes
9 money and she wasn't.
10      MR. BUTLER: My final comment is, this whole
11 proceeding, though I believe the Government filed the
12 indictment first, was initiated by Ms. Taylor. Ms.
13 Taylor wrote the Court asking that she be transferred
14 from the state here and initiate proceedings. She
15 waived pretrial -- I thought there was a pretrial
16 motion, waived it. She said no, don't want it, I want
17 to get this thing moving forward. I did this and --
18      THE COURT: Well, there's a double meaning in
19 trying to get into federal court which the Court is not
20 blind to, which is you want to get out of state custody.
21 In other words let's get this into federal custody. And
22 I don't know whether that's her intent or not, but I'm
23 very much aware of people doing that.
24      MR. BUTLER: That happens in some cases,
25 especially threats to the president when people don't

Page 129

1 like it, that was not the case here. This was a case
2 where she was almost done with her states time and
3 simply wanted to get into federal court so she could get
4 back to her family quickly, accept responsibility for
5 her conduct. I bring that up, Your Honor, because it is
6 my position, having worked with her for six months, that
7 Ms. Taylor is extremely contrite, extremely ready to pay
8 or do whatever is necessary to get this matter behind
9 her. She will not engage in any further criminal
10 conduct. And if she does, the penalties are going to be
11 dramatic.
12      THE COURT: Well, I think the way to make sure
13 that she understands that the penalty will be dramatic
14 is to make the initial penalty dramatic so she knows
15 when she gets into trouble next time, she will be going
16 away for an even longer time.
17      Anything else?
18      MR. BUTLER: No, Your Honor.
19      THE COURT: The Court will announce the
20 proposed sentence. While not bound to apply the
21 guidelines, the Court has consulted them and has taken
22 them into account on the issue of the appropriate range
23 of sentence to be imposed in this case.
24      Having made findings as to the objections to
25 the Presentence Report, the Court finds that the offense

Page 130

1  level is eleven, the criminal history category is six,
2  the guideline range is from twenty-seven to thirty-three
3  months, the supervised release period is from three to
4  five years on each count, and the fine range is from two
5  thousand to two million dollars.
6       Accordingly, pursuant to the Sentencing Reform
7  Act it is the order, judgment and decree of the Court
8  that the defendant is hereby committed to the custody of
9  the Federal Bureau of Prisons to be imprisoned for
10  thirty months.
11       It is further ordered that upon release from
12  imprisonment the defendant shall be placed on supervised
13  release for a term of five years. This term consists of
14  five years on each count, such terms to run
15  concurrently. Within seventy-two hours of release from
16  custody the defendant shall report to the probation
17  office in the district to the which she is released.
18       While on supervised release she shall comply
19  with the mandatory and standard conditions of supervised
20  release on file with the Court.
21       The Court also orders the following special
22  conditions. The defendant shall provide the probation
23  officer any requested financial information.
24       She shall not obtain new credit without the
25  approval of the Court, unless in compliance with the

Page 131

1  payment schedule.
2       She shall cooperate in the collection of
3  D N A.
4       She shall participate in a mental health
5  treatment program approved by the United States
6  Probation Office and contribute to the cost based on her
7  ability to pay and the availability of third party the
8  payments.
9       She shall submit to a search of her person,
10  residence, office and vehicle pursuant to the search
11  policy of the Court.
12       She shall pay to the United States District
13  Court Clerk a special assessment fee of two hundred
14  dollars which is due immediately.
15       Furthermore, because of her inability to pay,
16  the Court waives the imposition of a fine.
17       It is further ordered that she shall make
18  restitution to the United States Department of Education
19  in the amount of nine thousand forty-two dollars and
20  thirty-two cents which is due immediately. Any balance
21  remaining at the start of supervision shall be paid at
22  the rate of not less than one hundred and fifty dollars
23  per month.
24       Now this is to run concurrent with the
25  remainder of her state sentence. How should that

Page 132

1  language read, Probation?
2       THE PROBATION OFFICER: You can just simply
3  say concurrent with the sentences imposed in Montgomery
4  County Circuit Court, case numbers ninety-eight
5  ninety-four, that's C C ninety-eight ninety-four, C C
6  ninety-eight five eighty-one, C C ninety-eight fifteen
7  seventy-two, C C zero zero dash oh four and oh five and
8  oh six and zero seven and zero eight, C C zero one dash
9  seven zero four, C C zero one dash seven zero three, C C
10  zero one dash five oh three, C C zero two dash twelve
11  ninety-nine. That's it.
12       THE COURT: Okay. And the sentence is to run
13  concurrent with the remainder of the sentences in
14  ninety-eight dash ninety-four, ninety-eight dash five
15  eighty-one, ninety-eight fifteen seventy-two, zero zero
16  dash zero four, zero five, zero six, zero seven and zero
17  eight, zero one dash seven oh four, zero one dash seven
18  oh three, zero one dash five oh three and zero two
19  twelve ninety-nine.
20       MR. BUTLER: Your Honor, I think that clears
21  it up. It is my understanding that the intent,
22  therefore, is that the state sentence she is currently
23  serving, the remainder of that sentence, the beginning
24  at least of this sentence is to run concurrent with
25  that.

Page 133

1       THE COURT: That's exactly right.
2       And I want you to know, Ms. Taylor, that
3  because I did not order full restitution, I want you to
4  know that your attorney was successful in one regard.
5  You can't see my note here, but I was thinking about
6  giving you from forty to fifty months in prison. I was
7  going to give you an upward variance. In fact, I
8  started at thirty-three. I disagreed with the
9  recommended sentence of Probation of thirty.
10       So but for the arguments that were made within
11  the last hour and-a-half, you probably would have gotten
12  anywhere from forty to fifty months. I've got to get
13  your attention. You understand? I will not tolerate
14  any more taking of money.
15       THE DEFENDANT: Yes, sir.
16       THE COURT: That's the bottom line.
17       Now I ask you at this time, are there any
18  objections to the sentence imposed or to the manner in
19  which the Court pronounced it other than those
20  objections previously stated for the record? For
21  example, do you have any objection to the Court's
22  ultimate findings of fact or conclusions of law?
23  Furthermore, you are instructed that if you have an
24  objection, you must not only state the objection, you
25  must give the grounds for the objection.

Multi-Page

Page 134

1    MR. BUTLER: I have no further objections. I
2 believe Ms. Taylor has one thing she would like to
3 state.
4    THE COURT: Go ahead.
5    THE DEFENDANT: Your Honor, I never been to
6 prison before, and I have accepted my responsibilities,
7 and I do want to pay the money back. I tried. I just
8 didn't know -- I thought I was under the impression like
9 once I finished school I would have to start paying it
10 back then because it was a loan.
11    Your Honor, I am a changed person. I have
12 changed the way I have been thinking and doing things,
13 Your Honor. I just want to be home with my children,
14 see my daughter graduate. Your Honor, I missed all
15 their high school years, Your Honor. Can I please have
16 a chance to go home to my children? I will pay it back.
17 I ain't trying to blame nobody, Your Honor. I just said
18 it wrong and I'm sorry. I do take full responsibility
19 for what I did and I'm sorry.
20    I'm sorry, Your Honor. I ain't trying to
21 blame nobody else. I'm sorry and I want to take full
22 responsibility and I will pay back forty-seven thousand
23 dollars. When I was working I had a salaried job and I
24 was making good money. My husband and I together, we
25 both could have paid back the forty-seven thousand

Page 135

1 dollars, Your Honor. I want to pay the money. I tried
2 to get everything taken care of so I can pay it back.
3 Can you please be given a chance?
4    THE COURT: Well you have five years to prove
5 that to me once you get out on supervised release. And
6 I'll see whether you can hold up to your promise.
7    Do you have anything to say as to why the
8 sentence as announced should not be imposed, or do you
9 have anything to say in mitigation of the sentence?
10    MR. BUTLER: Nothing other than what's been
11 said.
12    THE COURT: It's the order, judgment and
13 decree of the Court that the sentence as announced is
14 hereby imposed.
15    Now to the extent that you still have a right
16 to appeal, you have ten days to file any notice of
17 appeal. If you cannot afford the cost of an appeal the
18 Court will allow you to appeal at no cost, including
19 furnishing you with a free transcript and a free
20 attorney.
21    You are in the custody of the marshal.
22    Court's in recess.
23    (Whereupon, the proceedings were concluded.)
24
25    * * * * * * * * * *

Page 136

1
2    COURT REPORTER'S CERTIFICATE
3
4    I certify that the foregoing is a correct
5 transcript from the record of proceedings in the
6 above-entitled matter as prepared by me to the best of
7 my ability.
8
9    I further certify that I am not related to any
10 of the parties hereto, nor their counsel, and I have no
11 interest in the outcome of said cause.
12
13    Dated this 17th day of May 2007.
14
15        /s/ Mitchell P. Reisner
16        MITCHELL P. REISNER, CM, CRR,
         Official US Dist. Court Reporter
17        Registered Professional Reporter
         Certified  Real-Time  Reporter
18
19
20
21
22
23
24
25

✎AO 245B   (Rev. 06/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

|  MIDDLE  | District of |  ALABAMA  |
|---|---|---|

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **V.** | |

| | | |
|---|---|---|
| BRIDGET Y. TAYLOR a/k/a BRIDGET MADISON | Case Number: | 2:06cr209-MHT |
| | | (WO) |
| | USM Number: | 12065-002 |
| | Kevin L. Butler | |
| | Defendant's Attorney | |

## THE DEFENDANT:

X pleaded guilty to count(s)   One and Two of the Indictment on 10/10/06

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 18 U.S.C. 1344 | Bank Fraud | 9/23/2004 | 1 |
| 18 U.S.C. 1014 | False Loan Application | 9/23/2004 | 2 |

   The defendant is sentenced as provided in pages 2 through ____6____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

January 22, 2007
Date of Imposition of Judgment

_Signature of Judge_

MYRON H. THOMPSON, U.S. DISTRICT JUDGE
Name and Title of Judge

1/24/2007
Date

AO 245B    (Rev. 06/05) Judgment in Criminal Case
              Sheet 2 — Imprisonment

DEFENDANT:        BRIDGET Y. TAYLOR a/k/a BRIDGET MADISON
CASE NUMBER:     2:06cr209-MHT

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

30 Mos. This term consist of 30 months on each count to run concurrent with each other and with Montgomery Co. Circuit Case Nos. CC98-94, CC98-581, CC98-1572, CC00-04, 05, 06, 07 & 08, CC01-704, CC01-703, CC01-503, CC02-1299 and CC04-1029

X The court makes the following recommendations to the Bureau of Prisons:
   1. The court recommends that the defendant be designated to a facility where mental health treatment is available.
   2. The court recommends that the defendant be designated to a facility near her family in Tulsa, Oklahoma.

X The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐  at _____  ☐ a.m.  ☐ p.m.  on  _____ .

   ☐  as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐  before 2 p.m. on _____ .

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
         Sheet 3 — Supervised Release

DEFENDANT:       BRIDGET Y. TAYLOR a/k/a BRIDGET MADISON
CASE NUMBER:    2:06cr209-MHT

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

5 Years. This terms consist of 5 years, each count, such terms to run concurrently.

　　　The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐　The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

X　The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

X　The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐　The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐　The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

　　　If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

　　　The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT:      BRIDGET Y. TAYLOR a/k/a BRIDGET MADISON
CASE NUMBER:    2:06cr209-MHT

# SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall provide the probation officer any requested financial information.

2. The defendant shall not obtain new credit without approval of the court unless in compliance with the payment schedule.

3. The defendant shall participate in a mental health treatment program approved by the United States Probation Office and contribute to the cost based on ability to pay and availability of third party payments.

4. The defendant shall submit to a search of her person, residence, office and vehicle pursuant to the search policy of this court.

Judgment — Page ___5___ of ___6___

| DEFENDANT: | BRIDGET Y. TAYLOR a/k/a BRIDGET MADISON |
|---|---|
| CASE NUMBER: | 2:06cr209-MHT |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 200 | $ | $ 9.042.32 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

X  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(I), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| United States Department of Education (REF#05-040011) | | $9,042.32 | |
| **TOTALS** | $                0 | $              9042.32 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

Case 2:06-cr-00209-MHT-CSC    Document 66    Filed 07/24/2007    Page 6 of 6

DEFENDANT:      BRIDGET Y. TAYLOR a/k/a BRIDGET MADISON
CASE NUMBER:    2:06cr209-MHT

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**   **X**   Lump sum payment of $ __9,242.32__ due immediately, balance due

      ☐    not later than _____ , or
      ☐    in accordance   ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   **X**   Special instructions regarding the payment of criminal monetary penalties:

      All criminal monetary penalty payments shall be made to the Clerk, United States District Court, Middle District of Alabama, Post
      Office Box 711, Montgomery, Alabama 36101. Any remaining at the start of supervision shall be paid at the rate not less than
      $150 per month.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
      and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

2-08cv209 MAT 1/23/07

Judge Thompson

RECEIVED

2007 JAN 25  A 11: 29

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Bridget Taylor
136 N. Court st
Prattville AL 36067

Thank you for staying within the guidelines on handing down my punishment. Your Honor I plead for a second chance I will apologize to the financial Institutions and victims by Publically wearing a sign stating my wrongs and listed my victims hours a day. I would like to do community service. Your Honor I have pd. on my state fines. Judge Greenhaw also ordered me to pay. more than one occassion I would go and pay for all bad checks Personally and Greenhaw dismissed the charge, I accept full responsibity while I was in Prison. Your Honor It became addicted as a drug addict and once I sat down long enough and realized I hit rock bottom I then began to try and correct them. I've written letters to the newspaper asking them to Publish theon me apologizing for all my mistakes I've written ellen brooks Apologizing. I've learned my lesson and seen my faults as if I went to a surgeon and he began to do surgery and found other problems and then began to fix them Your Honor Your the Judge and I Pray for a second chance Please your Honor I will pay all money. I

can not pay 650⁰⁰ a month but I can pay 150⁰⁰ and the months I can pay more I will. I will not lie or steal to pay back. I will not rob peter to pay paul. Your Honor can I have a chance on house arrest where I can work and do right and still be there to see my children and be there for my daughters graduation. I got your message loud and clear I will not steal anymore money, I'll do community service the entire time I'm home, because I do owe back to society. Your Honor I do not blame Anyone for my wrongs I accept full responsibilty as you can note from my previous letters I wrote before sentencing and when I was first questioned when I was at work release. Your Honor I have always worked. My grandmom said "Baby if you put as much effort into doing right as you did wrong, you'll be ok" Your Honor I'm ready to do that. I will no longer continue any crimes can I please prove to my family and society I have learned my lesson that the punishment I received thus far was feasible, I will be a dedicated member at church and give God my life and seek Him whole heartedly Because with out

him I'm nonething.

Your Honor I pray You can think about reconsidering me going home at the end of July. I will no longer blame anyone else I really want to be there for my children and be with my husband I will be a renewed person your Honor. Again I have heard your message and will do right by you and God Please give my children what they have been longing for, the opportunity to have both parents at home. My Husband allowed me back into his life and we were going to buy our first house. Your Honor I am very sorry for everything I've done wrong and no matter what I'll do community service of some sort to pay back to society and will pay all money I owe.

Please respond back                    Sincerly,
                                       Bridget Taylor

Thank You for reading my Letter. I'm not the same person, I've changed I do not think the same I have a new attitude and behavior.

Bridget Taylor
130 N. Court St.
Prattville AL 36067



MONTGOMERY AL 361

24 JAN 2007 PM 1 T

INMATE MAIL
AUTAUGA METRO JAIL

36104+0018

Judge Thompson
One Church St
Montgomery AL 36104

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


UNITED STATES OF AMERICA    )
                            )
      v.                    )    CRIMINAL ACTION NO.
                            )      2:06cr209-MHT
BRIDGET Y. TAYLOR           )

<u>ORDER</u>

It is ORDERED that defendant Bridget Y. Taylor's

motion for reconsideration (doc. no. 36) is denied.

DONE, this the 26th day of January, 2007.


        /s/ Myron H. Thompson
      UNITED STATES DISTRICT JUDGE

**Alabama Department of Corrections**
**Inmate Stationary**

Bridget Taylor 2:06cr209-MHT        2/02/07
8966 U.S. Hwy 231
Wetumpka AL 36092

Judge Thompson

I am asking for a reconsideration. I am very thankful for the thirty months. Your Honor I have been trying to get my life in order ever since July 09,04 I addressed my child hood experiences because I was advised by my counsel. I did blame people but once I hit rock bottom I began to seek my problems and I found out I was my only problem not my mother or anybody else. Your Honor my children and my Husband were really looking forward to me coming home in July. Your Honor I will not do any crimes. 3 years at Tutwiler is like six years, the time is twice as hard. Your Honor I will obtain a full time career and work with the community. Please reconsider me going home in July

**Alabama Department of Corrections**
**Inmate Stationary**

Of this year. I will keep my hands off other people things. I never been locked up this long and I have been broken. Your Honor I want to have another child with my husband, my daughter will be a senior this year. MS. Caple mentioned I could have gotten credit for all my time with the state and my children and husband received the same letter and they too have been disappointed again. Your Honor I am begging for a second chance if not for me can you do it for my children, husband, and family. Thank you for reading my mail. I am truly sorry for my wrongs.
Please Respond

Respectfully,
Bridget Taylor

Julia Tutwiler Prison
Bridget Taylor 224401
8966 U.S. Hwy 231
Wetumpka, AL 36092

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### PROBATION OFFICE

**LESLIE PRIM HOPEK**
CHIEF PROBATION OFFICER

**R. DWAYNE SPURLOCK**
DEPUTY CHIEF PROBATION OFFICER

Frank M. Johnson, Jr.
U. S. Courthouse Complex
One Church Street
Montgomery, AL 36104

Voice 334/954-3226
FAX  334/954-3230



**SANDRA G. WOOD**
SUPERVISORY PROBATION OFFICER
*PRETRIAL UNIT*

**SCOTT WRIGHT**
SUPERVISORY PROBATION OFFICER
*INVESTIGATIVE UNIT*

**DAVID RON THWEATT**
SUPERVISORY PROBATION OFFICER
*SUPERVISION UNIT*

October 16, 2006

Bridget Y. Taylor Madison
**AIS#:  224,401**

c/o Julia Tutwiler Prison for Women
8966 U.S. Highway 231 North
Wetumpka, AL  36092

**RE: Sentencing in Case #2:06cr209-WKW**

Dear Ms. Taylor (Madison),

This office received a copy of your letter dated October 9, 2006, and addressed to the Honorable W. K. Watkins, United States District Court Judge. Under the United States Sentencing Guidelines, it is very possible that you may be credited with some or all of the time served on your state sentence. Once I begin the presentence report investigation, I will have a more accurate profile of your sentencing range and the possible sentences that may be available in your case.

In your letter I notice that you plan to reside with your husband and children in Tulsa upon any release to supervision. You also mentioned "another full time management job". If you are already aware and certain of an available job placement, please make that information available so that it may be confirmed prior to your release. Additionally, if you have access to a state presentence investigation report you may release that report to me and return it to me at the above stated address so that I may attempt to expedite the sentencing in your case.

If you have any questions regarding this matter, please feel free to contact me through your attorney.

Sincerely,

Jacquelyn P. Carr
Senior United States Probation Officer

cc:  Kevin L. Butler,
     Federal Defender

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

UNITED STATES OF AMERICA     )
                             )
        v.                   )     CRIMINAL ACTION NO.
                             )        2:06cr209-MHT
BRIDGET Y. TAYLOR            )

ORDER

It is ORDERED that defendant Bridget Y. Taylor's

motion for reconsideration (doc. no. 40) is denied.

DONE, this the 8th day of February, 2007.

                        ___/s/ Myron H. Thompson___
                        UNITED STATES DISTRICT JUDGE

RECEIVED  2/18/07

Honorable Thompson

2007 FEB 21 A 10: 30

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

May I have Permission to go to the Boot Camp in Texas. I ask that the court make an order for me to go to the Boot Camp Facility for Women in the state Of Texas.

Bridget Taylor
2:06cr209-MHT

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


UNITED STATES OF AMERICA )
                         )
        v.               )   CRIMINAL ACTION NO.
                         )      2:06cr209-MHT
BRIDGET Y. TAYLOR        )

### ORDER

It is ORDERED that the motion to transfer to Boot Camp facility (Doc. No. 42) is denied.

DONE, this the 22nd day of February, 2007.


　　　　　　　　　　　　 /s/ Myron H. Thompson
　　　　　　　　　　UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **BRIDGET Y. TAYLOR** | ) | **CIVIL ACTION NO. 2:07cv404-MHT** |
| | ) | **(CR. NO. 2:06-CR-209-WKW)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |

## <u>AFFIDAVIT</u>

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| | ) |
| **COUNTY OF MONTGOMERY** | ) |

I, KEVIN L. BUTLER, state the following:

1.      I am an attorney admitted to practice law in Arizona, the Eastern District of California, the District of Nevada, the Middle District of Alabama, the United States Court of Appeals for the Ninth Circuit, the United States Court of Appeals for the Eleventh Circuit, and the United States Supreme Court. I have been employed as an Assistant Federal Public Defender for over 14 years and in the Middle District of Alabama since November 19, 1998.

2.      In order to prepare this affidavit, I have reviewed: (a) the Federal Public Defender's office file in *United States v. Bridget Taylor*, 2:06-CR-209-WKW; (b) my time records prepared in this matter; (c) the Court docket sheet in *United States v. Bridget Taylor*, 2:06-CR-209-WKW and (d) Ms. Taylor's Habeas Petition filed pursuant to 28 U.S.C. § 2255. Details not provided by my review of the case file and pleadings are based upon my best recollection.

3.  In her petition, Ms. Taylor asserts that because I failed to elicit testimonial evidence from three persons (i.e., her son, Lawrence Taylor; her sister, Monica Banks; and Mr. Anthony Wilson) who attended her sentencing hearing, I provided ineffective assistance at her sentencing and she is entitled to relief.

4.  Prior to Ms. Taylor's sentencing hearing, I spoke to all family members, friends and acquaintances who had graciously agreed to be present and possibly testify. After meeting with all persons, I determined that the most effective and persuasive testimony would be obtained from the four witnesses I called at the sentencing hearing. (i.e., Ms. Taylor's father, Lawrence Taylor; Ms. Taylor's step-mother, Willia Taylor; Ms. Taylor's sister, Valerie Hasty; and Dr. David Ghostly). I determined that further testimony would possibly be cumulative and detrimental to Ms. Taylor's sentencing.

Dated this 30th day of May 2007.

Respectfully submitted,

KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

Sworn and subscribed to before me this 30th day of May 2007.

NOTARY PUBLIC
My Commission expires: 8/30/10

# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **BRIDGET Y. TAYLOR** | ) | **CIVIL ACTION NO. 2:07cv404-MHT** |
| | ) | **(CR. NO. 2:06-CR-209-WKW)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2007, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following:

Verne Speirs, Esquire
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104

Respectfully submitted,

s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138